Colleen Dolan, P.J.
Fiesta Corporation ("Fiesta") appeals a judgment entered against it by the Circuit Court of Jefferson County after the jury returned a verdict of $1,500,000 in damages in favor of Adam Payne ("Respondent"). On appeal, Fiesta alleges multiple trial court errors: (1) the admission of deposition testimony from Respondent's expert witness, (2) the exclusion of evidence concerning Respondent's past medical bills and past lost wages, (3) the court's failure to declare a mistrial for an allegedly leading question by Respondent's trial counsel that unfairly prejudiced Fiesta, (4) the court's denials of Fiesta's motions for directed verdict and judgment notwithstanding the verdict, (5) the court's denial of Fiesta's motion for new trial based on an excessive verdict unsupported by the evidence, and (6) the court's denial of Fiesta's motion for remittitur. We find the trial court did not err on any of these matters. Thus, we affirm the judgment.
I. Factual Background
The litigation in this case stems from the pain and suffering sustained by Respondent *116 when he fell from a "Spaceball human gyroscope ride" ("the Spaceball") at a fundraising event on September 29, 2012. The event was organized by Hillsboro Youth Football and Cheer ("HYFC"), and Fiesta owned both the Spaceball and the recreational facility where the event was held.
Fiesta described the Spaceball and how it is operated as follows:
The Spaceball is a single-seat human gyroscope that inverts and rotates its rider. To prevent the rider from exiting the ride mid-operation, the Spaceball is equipped with a harness that is locked in place with a cotter pin and secures the rider to the chair. The Spaceball is controlled by an operator who manually spins a control wheel to cause the rider to invert and rotate.
Representatives of HYFC wanted to sell tickets to ride the Spaceball. Fiesta alleges that it provided training for certain HYFC staffers to operate the Spaceball but these trained staffers failed to show up and operate the Spaceball on the day of the event. Respondent alleges "Fiesta never provided training on the Spaceball to anyone from HYFC." Thus, under either version of the facts, the Spaceball was left unattended. Nonetheless, the Spaceball was used by patrons, including Respondent. Shawn James, an employee of Fiesta, testified that he saw people using the Spaceball "all night long" without supervision, but neither he nor any other employee of Fiesta acted to stop the unsupervised use of the Spaceball.
As there was no trained personnel to oversee patrons, Respondent relied on a couple of bystanders to enter the ride and secure him with the harnesses. Respondent contends that he was not aware that the people helping him were bystanders and he believed they were part of a trained staff qualified to operate the ride. Respondent testified that the two bystanders were not wearing any special type of clothing or uniform to indicate an affiliation with Fiesta, but no one else at the event-including Fiesta employees-wore such apparel either. These untrained bystanders did not properly secure Respondent into the ride. Consequently, as Respondent's brother-in-law manually operated the ride and "[gave] it a good spin," Respondent fell out of the Spaceball head first onto the steel flooring of the ride. Respondent testified that the fall caused him tremendous pain immediately. He also testified that after he went to bed that night, he woke up in the middle of the night and had to vomit. Respondent stated he was still in "an incredible amount of pain" the next morning, and consequently, he went to the emergency room. Respondent went to St. Clare Hospital and had his neck examined by Dr. Eric Sincoff, who diagnosed Respondent with an acute left C4 facet joint fracture. Additionally, Dr. Sincoff determined that Respondent suffered from pre-existing scoliosis and a curvature in his neck and spine that would continue to worsen with time. Part of the condition involved degenerative joint disease, which affected disks C3-4, C4-5, and C5-6.
Respondent filed suit against Fiesta and Thomas Kerr-Fiesta's President-on March 28, 2013. Respondent then filed a first amended petition on November 11, 2013, adding HYFC as a defendant. Finally, Respondent filed a second amended petition on November 12, 2014 (herein "Amended Petition"), which is the subject of the underlying litigation in this matter. Respondent's Amended Petition included claims of negligence against Fiesta and HYFC. In the Amended Petition, Respondent claimed that Fiesta's negligence caused him $54,000 in medical expenses and $9,000 in lost wages at the time of filing the petition. Respondent also claimed *117 that his injuries would force him to incur "future medical care and substantial future medical expenses," and he alleged his "ability to continue gainful employment has been destroyed and he will suffer future lost wages and diminished earnings capacity in the future." Further, Respondent alleged that his "ability to enjoy a normal life has been permanently altered as a result of [Fiesta's] negligence." Before the trial, Respondent dismissed his claims of "past medical bills and past loss wages" from the Amended Petition.
Two trials were held in this case. Before the first trial, on January 29, 2016, Respondent dismissed its negligence claim against HYFC-which removed HYFC as a party from the action. The first trial commenced on February 2, 2016. However, the court declared a mistrial, finding Respondent's counsel elicited prejudicial testimony from a witness. The case was reset and tried from November 8-10, 2016.
During closing argument, Respondent's counsel suggested that the jury should award between $500,000 and $750,000 to Respondent for his future pain and suffering. On November 11, 2016, the jury returned a verdict assessing 100% of the fault to Fiesta. The jury also determined that Fiesta's negligence caused $1,500,000 in damages to Respondent.
a. Evidence Presented at Trial
i. Video Deposition Testimony of Dr. Levy
Dr. Armond Levy is a board-certified neurosurgeon who actively practices neurosurgery. Dr. Levy performed several physical examinations on Respondent and prescribed treatments, such as physical therapy and pain management. Dr. Levy's qualifications to be considered an expert witness are undisputed.
Prior to Dr. Levy's doctor-patient relationship with Respondent, Respondent saw Dr. Sincoff for his neck injury. Respondent first visited Dr. Sincoff the day after he fell from the Spaceball in November of 2012. Dr. Sincoff continued to provide care for Respondent until he left his practice, at which point Dr. Levy began treating Respondent.
Dr. Levy relied on some of Dr. Sincoff's notes to care for Respondent, which he often alluded to throughout the deposition. Dr. Levy testified that Dr. Sincoff diagnosed Respondent with an acute facet fracture of his C4 facet joint-"acute" meaning "[i]t had just occurred"-which Dr. Levy said was reflected by the records from the emergency room on the day after Respondent's fall. While Dr. Sincoff was treating Respondent, he initially noted that fusion surgery to the cervical spine in Respondent's neck was a possible course of treatment, but Dr. Sincoff decided it would be prudent to try more conservative measures before recommending the surgery; these conservative measures included "physical therapy, injections, wearing a cervical collar, resting, [and] various kinds of medications."
Dr. Levy first saw Respondent in August of 2013, approximately a year after his fall from the Spaceball. Respondent told Dr. Levy that the pain in his neck had not lessened since the injury. Also, records from Respondent's primary care physician show he had never complained of neck injury before the Spaceball incident. Dr. Levy testified that-within a reasonable degree of medical certainty-there was a connection between the Spaceball incident and Respondent's neck pain. Dr. Levy also opined that Respondent's pain had been "set in motion by the fall."
Dr. Levy discussed the possibility of a three-level cervical fusion surgery to help alleviate some of Respondent's pain. Pain *118 was Respondent's primary motivating factor for considering the surgery. Dr. Levy noted that his recommendation of surgery was largely dependent upon Respondent's pain tolerance. Dr. Levy also noted that unless the surgery was performed, Respondent would likely need to do certain things throughout his lifetime to manage his pain, such as taking medication, doing physical therapy, and receiving injections. Although Dr. Levy had hoped to solve the problem with a much less invasive surgery ("a posterior left C 4 foraminotomy"), he eventually reverted back to his original, "more aggressive" suggestion of the three-level fusion surgery. Dr. Levy further testified that Respondent's fall from the Spaceball caused or contributed to the injury for which Dr. Levy recommended surgery be performed.
ii. Lay Witness Testimony
Testimony from lay witnesses is discussed in more depth where it is most relevant infra. Respondent provided testimony to describe his personal experience with enduring neck pain after his fall. He also testified about how this pain hindered his ability to participate in certain activities that he had been able to before his injury, including playing games with his children. His co-worker, Bobby Wayne Spurlock, and his wife, Ashley Payne ("Wife"), both testified as to how his life had been impacted after the Spaceball fall. They testified about the neck pain of which Respondent often complained and that Respondent was incapable of doing certain things that he could before his fall. Wife also testified that Respondent has difficulty sleeping, especially in the summer, due to his neck pain.
b. Fiesta's Motions
Fiesta called Dr. Donald Brancato to the stand as an expert witness. Dr. Brancato is an orthopedic surgeon. During the testimony of Dr. Brancato, Fiesta objected to Respondent's line of questioning and moved for a mistrial, claiming improper injection of the issue of insurance. The court sustained Fiesta's objection, but denied its motion for mistrial. At the close of Respondent's evidence, Fiesta moved for a directed verdict, which the court denied. Once again, Fiesta moved for a directed verdict after the close of all the evidence, which the trial court also denied. After the verdict was rendered, Fiesta timely filed a motion for new trial, a motion for judgment notwithstanding the verdict, and a motion for remittitur pursuant to § 537.068.[1] The trial court denied all of these motions. This appeal follows.
II. Discussion
The jury rendered a verdict in favor of Respondent on his negligence claim. For a plaintiff to prevail on a negligence claim, he or she must establish that (1) the defendant owed a duty to him or her; (2) the defendant breached that duty; (3) causation; and (4) "injury" or "actual damages." Peters v. Wady Indus., Inc. , 489 S.W.3d 784, 793 (Mo. banc 2016) ; Friday v. McClure , 536 S.W.3d 235, 239 (Mo. App. W.D. 2017).
a. Point I-Admission of Expert Deposition Testimony of Dr. Levy
i. Standard of Review
In civil actions, the admissibility and sufficiency of expert testimony is governed by § 490.065.[2] Essentially, § 490.065 *119 establishes four requirements for the admission of expert testimony: "1) the expert witness must be qualified; 2) the testimony will assist the trier of fact; 3) the expert's testimony is based on facts or data of a type reasonably relied on by other experts in the field; and 4) the facts or data used by the expert are otherwise reasonably reliable." Spalding v. Stewart Title Guar. Co. , 463 S.W.3d 770, 778 (Mo. banc 2015). "The decision to admit or exclude expert testimony is within the trial court's discretion, and we will not reverse the decision absent an abuse of discretion." Colt Investments, L.L.C. v. Boyd , 419 S.W.3d 194, 197 (Mo. App. E.D. 2013). A trial court abuses its discretion if its decision was "against the logic of the circumstances and was so arbitrary or unreasonable as to shock the sense of justice and indicate a lack of careful consideration." Kirk v. State , 520 S.W.3d 443, 460 (Mo. banc 2017).
ii. Analysis on Point I
Before trial, Fiesta filed a motion to strike the deposition testimony of Dr. Levy in its entirety. Once again, immediately before Dr. Levy's video deposition was to be played at trial, it renewed its motion to strike the testimony. The court overruled both of these motions, finding that Fiesta's complaints about the testimony went "to the weight of it, not the admissibility of it."
On appeal, Fiesta argues that "[t]he circuit court erred in admitting the deposition testimony of Dr. Levy on causation and future pain and suffering because [his] testimony lacked a sufficient basis and was speculative ... and the admission of this testimony unfairly prejudiced Fiesta." Specifically, Fiesta argues that Dr. Levy's testimony was too speculative to establish (1) causation and (2) future pain and suffering (i.e., the extent of damages caused by the fall). Expert witnesses must provide testimony within a reasonable degree of medical certainty to support causation. Edgerton v. Morrison , 280 S.W.3d 62, 69 (Mo. banc 2009). Fiesta notes that Respondent had a pre-existing condition which may have caused, or at least contributed to cause, Respondent's damages, such as the possibility of an expensive future surgery. Dr. Levy described the condition as "a preexisting degenerative and scoliotic deformity" in Respondent's neck. Fiesta further contends that Dr. Levy's testimony was the only evidence presented to establish the essential element of "causation" in Respondent's negligence claim. See Peters , 489 S.W.3d at 793. Thus, Fiesta argues that if Dr. Levy's testimony was properly excluded, Respondent would have failed to make a submissible case.
Dr. Levy's Bases for His Expert Testimony
Fiesta points out that Respondent was diagnosed with a "pre-existing degenerative and scoliotic deformity," which likely, at minimum, contributed to Respondent's pain. Numerous times, Fiesta references the pre-existing condition and highlights where Dr. Levy opined that the pre-existing condition likely contributed to Respondent's injury in some manner. To the extent Fiesta is suggesting it is shielded from liability by a concurrent, contributing cause, that argument necessarily fails; the general rule is that a defendant can be held liable for negligence even if some *120 other independent, intervening cause contributed to the injury, and even if the injury would not have occurred without that independent, intervening cause. Sanders v. Ahmed , 364 S.W.3d 195, 209 (Mo. banc 2012).
Throughout Fiesta's appellant's brief, it directs us to portions of the transcript of Dr. Levy's testimony where Dr. Levy expresses uncertainty with his opinion, which arguably would have been considered inadmissible if specific objections were made. Nonetheless, there are portions of Dr. Levy's testimony where he expressly opines on the issues of causation and damages within a reasonable degree of medical certainty. Because Fiesta sought a wholesale exclusion of the deposition testimony, the court would have had to exclude relevant, admissible testimony to grant Fiesta's request.
At the beginning of Dr. Levy's testimony, he agreed to offer all of his opinions to a reasonable degree of medical certainty whenever possible and indicate when he would depart from that standard. Consistent with this testimony, at times, Dr. Levy would equivocate or speculate on certain matters after disclosing that he could not opine "to a reasonable degree of medical certainty" on some matters. Still, on many occasions throughout the deposition, Dr. Levy would provide testimony without hedging or equivocating, thereby conforming with the requirement that his opinion is made within "a reasonable degree of medical certainty." For example, the transcript reflects the following exchanges:
Q. Do you have an opinion on a more likely than not basis whether there's a connection between [Respondent's] fall on September 29, 2012 and his spine, neck, and low back complaints?
A. .... So speaking about his neck, I think I've been pretty consistent in my report and my discussion with you that, and also in my medical records in general, that I feel that Adam had a-a preexisting degenerative and scoliotic deformity, a combination of both in his neck. Nonetheless, his fall obviously produced the-the tangible evidence of a fracture but physiologically gave him a-a functional problem going forward that ... set off and/or exacerbated by the-by the injury.
Q. Within a reasonable degree of medical certainty is there a connection between the September 29, 2012 fall and the-his-his spine or cervical spine neck complaints?
A. Yes, I think that there is.
Q. And in terms of your-your surgical recommendation of the three-level fusion, would that be caused or contributed to cause by the September 29, 2012 fall that we've been talking about?
A. Ultimately, yes.
Additionally, Dr. Levy gave testimony that MRI, CT, and x-ray scans from the emergency room revealed an acute (i.e., recently developed) "left C4 facet joint fracture," which supports that the fracture was caused by Respondent's fall from the Spaceball. The fracture had healed by the time of the trial. Nonetheless, Dr. Levy concluded that Respondent's pain was caused, at least in part, by nerve damage to the C4 root resulting from the fall. He reached this conclusion after he observed that giving Respondent C4 nerve root injections provided some temporary relief to Respondent, stating "[t]he subsequent relief with the nerve root injection would seem to suggest that the nerve root and its environment were the source of his pain." Dr. Levy testified that all of his opinions would be to a degree of medical certainty unless he stated otherwise.
Fiesta points out that Dr. Levy explicitly stated he could not explain the exact *121 mechanics of how and why Respondent's C4 nerve root continued to be a source of pain after Respondent's fracture fully healed. This is accurate; Dr. Levy admitted that it was just his "theory" that the fracture "compromised" the nerve which caused Respondent pain. However, all that Dr. Levy was required to opine within a reasonable degree of medical certainty was that the fall was the cause of Respondent's complaints of pain. Dr. Levy even testified within a reasonable degree of medical certainty that without the fusion surgery, Respondent's "symptomatology is going to be more or less permanent." Dr. Levy expressed his opinion to a reasonable degree of medical certainty, and his opinion was founded on relevant, factual information, such as Respondent's medical records, which showed no complaints of neck pain prior to his fall, a history of Respondent's treatment following the fall, including various injections, the results of MRIs, CT scans, and x-rays, and Dr. Levy's own personal physical examination of Respondent. Thus, many portions of Dr. Levy's deposition testimony satisfy the requirements of § 490.065 and are admissible.
Primarily, Dr. Levy's testimony was most relevant to establishing the "causation" element of Respondent's negligence claim. However, Dr. Levy's testimony also helped establish the extent of Respondent's injury. For example, Dr. Levy testified to the fact that Respondent had an increased risk of needing to undergo surgery in the future, even recommending that Respondent undergo a three-level fusion surgery. Dr. Levy did not need to testify that, to a reasonable degree of medical certainty, Respondent would be required to undergo surgery.
In Swartz v. Gale Webb Transp. Co ., our Supreme Court found that testimony explaining the plaintiff's increased likelihood of needing surgery "was admissible for purposes of establishing the extent and nature of her injuries." 215 S.W.3d 127, 132 (Mo. banc 2007). In that case, it was clear the expert did not testify, to a reasonable degree of medical certainty, that the plaintiff would need to have the procedure performed. Id. He merely opined that "[the plaintiff's] back injury carries with it at least a 25 percent chance, and perhaps a 50 percent chance, of requiring surgery in the future...." Id. at 132-33. In Swartz , the Court reasoned that the fact that the plaintiff's "present injury brings with it this increased risk of future surgery is information the jury should have in the difficult task of trying to give plaintiff's condition a dollar value." Id. Similarly, in the case at bar, Dr. Levy opined that, within a reasonable degree of medical certainty, Respondent was at an increased risk for surgery as a result of his fall from the Spaceball. Like in Swartz , we find that this testimony was admissible to help the jury assess the extent of Respondent's damages caused by the fall. Id.
Based on the foregoing, we do not find that the trial court abused its discretion in refusing to exclude the entirety of Dr. Levy's video deposition testimony.[3] Additionally, because Dr. Levy's testimony was admissible, there was sufficient evidence for a jury to find that Fiesta caused Respondent's injury (at least in part) and determine the fair and reasonable compensation Respondent should be awarded due to his pain and suffering that resulted from his fall from Fiesta's Spaceball. Outside of Fiesta's assumption of risk argument, *122 which we address infra , Fiesta does not challenge that Respondent failed to meet the first two elements of a negligence claim (duty and breach). Peters , 489 S.W.3d at 793. Thus, Fiesta cannot establish that Respondent failed to make a submissible case for negligence, as there was sufficient evidence for a reasonable jury to find (1) Fiesta owed Respondent a duty; (2) Fiesta breached that duty; (3) Fiesta caused or contributed to cause Respondent's injury; and (4) Respondent suffered an injury or "actual damages." Id. ; Howard v. Frost National Bank , 458 S.W.3d 849, 853 (Mo. App. E.D. 2015 ). Point I is denied.
b. Point II-Exclusion of Medical Bills and Lost Wages
i. Standard of Review
"A trial court 'enjoys considerable discretion in the admission or exclusion of evidence, and, absent clear abuse of discretion, its action will not be grounds for reversal.' " Cox v. Kansas City Chiefs Football Club, Inc. , 473 S.W.3d 107, 114 (Mo. banc 2015) (quoting Moore v. Ford Motor Co. , 332 S.W.3d 749, 756 (Mo. banc 2011) ). "A ruling constitutes an abuse of discretion when it is 'clearly against the logic of the circumstances then before the court and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration.' " Id. (quoting Lozano v. BNSF Ry. Co. , 421 S.W.3d 448, 451 (Mo. banc 2014) ).
ii. Preservation of the Issue
At least in part, the trial court denied Fiesta's motion for a new trial based on the exclusion of medical bills and evidence of lost wages because Fiesta failed to preserve the objection by failing to offer medical bills or proof of lost wages into evidence. Fiesta claimed that the trial court improperly granted Respondent's motion in limine to exclude evidence of Respondent's past medical bills and lost wages. The court granted Respondent's motion in limine, reasoning that because Respondent dismissed his claims for past medical bills and lost wages, evidence on those issues were no longer relevant. Respondent did not seek to have evidence of past medical bills or lost wages admitted at any point during the trial. In fact, during the pre-trial conference, Fiesta's counsel merely stated that he may want to introduce amounts of Respondent's medical bills "as a matter of strategy," but he conceded, "I may not do that. I'm not representing to you now that I certainly intend to [try to admit evidence of Respondent's medical bills]."
"The court's ruling on a motion in limine is interlocutory and subject to change during the course of the trial." Hancock v. Shook , 100 S.W.3d 786, 802 (Mo. banc 2003). By itself, a motion in limine "preserves nothing for appeal." Id. To properly preserve a challenge to the trial court's exclusion of evidence "[t]he proponent of the evidence must attempt to present the excluded evidence at trial," and if the evidence remains excluded, then the proponent is required to make an offer of proof. Id. Fiesta failed to take either of these steps.
"The purpose of an offer of proof is twofold: [1] to educate the trial judge on the admissibility of the evidence with the hope that he or she will reconsider; and [2] to preserve the issue for appellate review." Bradley v. State , 440 S.W.3d 546, 556 (Mo. App. W.D. 2014). "A proper offer of proof demonstrates: 1) what the evidence will be; 2) the purpose and object of the evidence; and 3) each fact essential to establishing the admissibility of the evidence." Id. (quoting State v. Tisius , 92 S.W.3d 751, 767 (Mo. banc 2002) ). Fiesta did not attempt *123 to admit anything into evidence with regards to Respondent's past medical bills or past lost wages, nor did Fiesta make an offer of proof to explain why such evidence should be admitted at any point during the trial. Thus, typically, Fiesta's challenge would be unpreserved for appellate review.
That being said, there is a "very narrow" exception to the general rule that a proponent of evidence must seek to introduce the evidence at issue and make an offer of proof upon exclusion to preserve the issue for appeal; Fiesta contends this narrow exception is applicable here, thereby preserving its Point II for our Court's review. This exception is only applicable when three requirements are met by the proponent of the evidence: "First, it requires a complete understanding, based on the record, of the excluded [evidence]. Second, the objection must be to a category of evidence rather than to specific [evidence]. Third, the record must reveal the evidence would have helped its proponent." Calzaretta v. Willard , 391 S.W.3d 488, 494 (Mo. App. S.D. 2013) (quoting Frank v. Envtl. Sanitation Mgmt., Inc. , 687 S.W.2d 876, 883-84 (Mo. banc 1985) ); see also Russell v. Dir. of Revenue , 35 S.W.3d 507, 510 (Mo. App. E.D. 2001).
In this case, Fiesta claims the trial court erred in not allowing it to introduce evidence of Respondent's past medical bills and past lost wages. However, we find that there is not a "complete understanding" of the evidence Fiesta claims was erroneously excluded, which leaves Fiesta's challenge unpreserved. Fiesta speculates that the total amount of past medical bills and past lost wages were $54,000 and $9,000, respectively. These figures represent the amount of damages Respondent previously alleged in his petition before he dismissed those claims prior to trial. However, as the trial court noted during arguments on Fiesta's post-trial motions, "the record doesn't reflect anything about [the medical bills] at all ." (emphasis added). Moreover, during Fiesta's arguments on its motion for directed verdict and its motion for a new trial, Fiesta conceded that the medical bills would only be relevant if the foundation was laid to show they were "fair and reasonable" and necessary for treatment of the injury sustained by Respondent as a consequence of falling from the Spaceball. Fiesta also admitted that it could not have laid the foundation without testimony from a qualified expert, and it made no attempt to lay the foundation for any medical bills.
Accordingly, Fiesta has failed to show it has preserved Point II for appeal.
c. Point III-Denial of Fiesta's Motion for Mistrial
In Fiesta's third point on appeal, it alleges the trial court abused its discretion in denying its motion for mistrial because Respondent's trial counsel-in bad faith-injected the issue of insurance by posing a leading question to an expert witness that unfairly prejudiced Fiesta.
i. Standard of Review
"A mistrial is a drastic remedy that should be granted only in exceptional circumstances." Delacroix v. Doncasters, Inc. , 407 S.W.3d 13, 24 (Mo. App. E.D. 2013). We afford the trial court great discretion in deciding whether a mistrial should be granted, and we will reverse its denial of a motion for mistrial only if the denial was a "manifest abuse of discretion." Id. "A manifest abuse of discretion occurs only when the error is so grievous that prejudice cannot be removed [through less drastic means]." Id. at 24-25. We recognize that the trial court is better positioned to assess the prejudicial effect that improper evidence has on the jury. Id.
*124 In general, it is improper for counsel to inject the issue of the existence of liability insurance into an action for damages. Wheeler ex rel. Wheeler v. Phenix , 335 S.W.3d 504, 514 (Mo. App. S.D. 2011). "The injection of insurance into a case may constitute reversible error if done in bad faith." Id. Nonetheless, although improper, "not every reference to insurance warrants reversal," and "[t]he party alleging the references [to insurance] constitute reversible error must demonstrate that it was prejudiced by the references." Id. Our Court recognizes that the trial court is in a much better position to determine whether the issue of insurance was injected in bad faith and if the injection had a prejudicial effect on the jury. Saint Louis Univ. v. Geary , 321 S.W.3d 282, 293-94 (Mo. banc 2009).
Before trial, the trial court granted Fiesta's motion in limine to preclude Respondent from referencing Fiesta's liability insurance. The specific allegedly "leading question" and response at issue occurred during Respondent's counsel's cross-examination of Fiesta's expert witness, Dr. Brancato. The exchange is reflected in the trial transcript:
Respondent's Counsel : And in terms of the money that you have already received, as you're sitting here right now, as we're talking, the meter is running, so to speak, right, you're being paid for your time here today?
Dr. Brancato : That's correct.
Respondent's Counsel : All right. And the money that you get, it did not come from the Kerrs or from Fiesta Corporation ...
At that point, Respondent's counsel's question was cut off by Fiesta's counsel's objection and the attorneys approached the bench. The trial judge warned Respondent's counsel that he needed to avoid any references to insurance, saying he would "mistry [the case] again."
Fiesta argues that Respondent's counsel injected the issue of insurance in bad faith. Primarily, Fiesta points out that its motion in limine was granted and the case had been previously mistried due to a reference to insurance, and thus, Respondent's counsel was on notice that insurance should not be referenced and it injected the issue anyways. However, after reviewing the record before us, it is not clear that Respondent intended to inject the issue of liability insurance. Immediately after Fiesta's counsel's objection, the attorneys approached the bench and the following exchange occurred:
Trial Court : What the heck was that?
Fiesta's Counsel : It's injecting insurance.
Trial Court : It's injecting insurance.
Respondent's Counsel : Did I say that?
Shortly after Dr. Brancato left the stand, outside the presence of the jury, Fiesta's counsel made an oral motion for mistrial, explaining:
[T]he jury knows or reasonably [presumes] that I'm being paid to be here. We've already had the witnesses testify that he's being paid for his time. And so to then ask him, you know, that my clients aren't paying for that fee, clients, in the name of the insureds in this case and my clients of record, I think [that] begs the question of insurance and unfairly injects insurance.
Respondent's attorney explained his basis for the allegedly leading question, stating:
[M]y response is that the question elicited had to do with whether or not the doctor, not whether or not [Fiesta's counsel] was getting money from the Kerrs. And that goes to the doctor's bias, which I'm permitted to explore *125 since [Fiesta's counsel] is the one hiring him and seeking his opinions.
In assessing the arguments made by both trial attorneys, the trial court stated:
Well, there are two possible answers in my view. One possible answer would have been the insurance company, which would have resulted in an immediate mistrial at that moment, which [I] tried to stop. The other possible answer is you, the counsel for [Fiesta,] because I know that a lot of times the check comes from the attorney's office. The good news is, no answer was given at all. So we had a 50/50 shot at a mistrial, which I think we stopped. No answer was given at all because I sustained the objection. And so I think we've preserved things, and I think we're okay.
Respondent's counsel's seemingly surprised reaction to being told he was "injecting insurance" supports Respondent's argument that the question was not presented in bad faith with the intention of injecting insurance; rather, he was attempting to show the expert witness was being paid by Fiesta's counsel and he may be biased in Fiesta's favor. See Moon v. Hy-Vee, Inc. , 351 S.W.3d 279, 284 (Mo. App. W.D. 2011) (explaining that "[p]arties are given wide latitude in their cross-examination of expert witnesses ... [and] the witness's bias or prejudice may always be shown, subject to the trial court's discretion"). As usual, the trial court was in a much better position to analyze Respondent's counsel's intent when he raised the question to Dr. Brancato. See Saint Louis Univ. , 321 S.W.3d at 293-94. The trial court also concluded Fiesta was not prejudiced and denied Fiesta's request for a mistrial. Fiesta's request for mistrial based on the leading question was once again raised in a post-trial motions. The trial court reiterated that it believed it had stopped the issue of insurance from coming in because the word "insurance" was not uttered.
Our Court is "mindful that trial courts are in the best position to observe a party's motivation [for alluding to insurance], and likewise, are in the best position to determine whether a party's conduct has 'incited prejudice in the jury.' " Rider v. The Young Men's Christian Ass'n of Greater Kansas City , 460 S.W.3d 378, 391 (Mo. App. W.D. 2015). It is apparent the trial court found the question had little to no prejudicial effect on the outcome. We find the trial court's conclusion to be reasonable. There is nothing in the record to suggest the question had a prejudicial effect on the jury. In fact, it is quite possible that the jury did not infer Dr. Brancato was being paid by an insurance company. See McMillin v. Union Elec. Co. , 820 S.W.2d 352, 354 (Mo. App. W.D. 1991) (explaining that when the word "insurance" is not explicitly mentioned, it is speculative to conclude the jury inferred the defendant had liability insurance). Given that the trial court is in a better position to judge the prejudicial effect of the alleged leading question, we defer to its assessment on the matter. Fiesta has not demonstrated that it was "prejudiced" by the allegedly implied reference to liability insurance; thus, it has not shown the trial court made an error so grievous in nature that prejudice could not otherwise be removed. Delacroix , 407 S.W.3d at 25-26.
Based on the foregoing, we deny Point III.
d. Point IV-Motions for Directed Verdict and Judgment Notwithstanding the Verdict
In Fiesta's fourth point on appeal, it contends that the trial court "erred in denying Fiesta's motion for directed verdict and motion for judgment notwithstanding the verdict because the evidence established that Respondent had assumed *126 the risk of falling out of the Spaceball," and the trial court "did not rule that Respondent's fall from the Spaceball was a risk inherent in riding the Spaceball under the circumstances that existed[.]"
i. Standard of Review
Our review of a request for judgment notwithstanding the verdict or a directed verdict is "essentially the same standard" as de novo review. Ellison v. Fry , 437 S.W.3d 762, 768 (Mo. banc 2014). We will only reverse a trial court's denial on a motion for JNOV or directed verdict if either the plaintiff has not made a submissible case or the defendant establishes an affirmative defense as a matter of law. Id. ; Poage v. Crane Co. , 523 S.W.3d 496, 514 (Mo. App. E.D. 2017). "A motion for directed verdict or JNOV should be granted if the defendant shows that at least one element of the plaintiff's case is not supported by the evidence." Ellison , 437 S.W.3d at 768. "We will only reverse the jury's decision if 'there is a complete absence of probative fact to support the jury's conclusion.' " Poage , 523 S.W.3d at 514 (quoting Smith v. Brown & Williamson Tobacco Corp. , 410 S.W.3d 623, 630 (Mo. banc 2013) ). "We view the evidence 'in the light most favorable to the jury's verdict, giving the plaintiff all reasonable inferences and disregarding all conflicting evidence and inferences.' " Id. at 510 ( Smith , 410 S.W.3d at 630 ).
ii. Analysis on Point IV
In Fiesta's first argument under this point, it contends "the circuit court failed to determine, as a matter of law, whether Respondent's claims were barred by assumption of risk," which "effectively deprived Fiesta of its affirmative defense." We disagree with Fiesta's assessment.
Fiesta raises three sub-arguments under Point IV: (1) the trial court erred by failing to rule on whether the Spaceball was inherently risky at the time of the injury; (2) the Spaceball was inherently risky at the time of the injury; and (3) the evidence established that Respondent "knowingly and voluntarily" assumed the risk of riding the Spaceball.
Implied Primary Assumption of Risk
"Implied assumption of risk includes two sub-categories, implied primary and implied secondary." Lewis v. Snow Creek, Inc. , 6 S.W.3d 388, 395 (Mo. App. W.D. 1999). However, Missouri only recognizes the doctrine of implied primary assumption of risk.[4] Coomer v. Kansas City Royals Baseball Corp. , 437 S.W.3d 184, 204 (Mo. banc 2014). Fiesta only argues that the implied primary assumption of risk doctrine applied here. If the implied primary assumption of risk is applicable, it acts as a complete bar to recovery. Id. at 192. In Missouri, implied primary assumption of risk does not operate as an affirmative defense to a negligence claim; rather, it establishes that the defendant owed no duty to the plaintiff, thereby negating an essential element of a negligence action. Id. at 193. Accordingly, whether the primary implied assumption of risk doctrine *127 is applicable is a question of law for the court. Id. at 199 ("The question of whether and to what extent the defendant owes a duty to the plaintiff is always a question for the court, not the jury.").
Implied primary assumption of risk precludes a plaintiff from recovering damages for injuries that are "inherent risks" of participating in a particular activity. Id. (explaining that being hit by a foul ball is an inherent part of watching a major league baseball game, while the risk of a mascot throwing hotdogs into the stands and hitting someone in the eye, which was the underlying event for the plaintiff's negligence claim, is not an inherent or unavoidable risk). The key to evaluating if this doctrine applies is determining whether the injury complained of stems from an inherent risk of participating in the activity during which the injury occurred, which is also a question of law for the court:
When the risk arises from the circumstances (e.g., from a condition on the defendant's property or the inherent nature of the defendant's activity), "implied primary assumption of the risk" completely bars recovery by a plaintiff who knowingly and voluntarily encounters that risk. When the risk is created by defendant's negligence, on the other hand, this has been identified as "implied secondary assumption of the risk."
Id. at 188, 192.
Inherent Risk Defined
An inherent risk is "structural or involved in the constitution or essential character of something." Id. at 201. For a risk to be characterized as inherent, it must remain present "until there is a fundamental change in that thing's constitution or essential character." Id. Moreover, a plaintiff is not barred from recovering damages if a defendant's negligence "altered or increased one of these inherent risks [that] caused [the plaintiff's] injury." Id. at 199.
Argument One: The Trial Court's Failure to Rule on Inherent Risk
Fiesta argues that the trial court was required to make a finding that there was not an "inherent risk" in riding the Spaceball before submitting the case to the jury. However, the first time we see Fiesta argue about the "inherent risk" of riding the Spaceball is during its post-trial motions. Obviously, the argument was raised to the trial court after instructions were submitted to the jury. During the instruction conference, it is clear that Fiesta's argument was based solely on Respondent purportedly having knowledge of the risk and voluntarily riding the Spaceball despite that knowledge. Fiesta argued:
[T]he plaintiff, himself, admitted that he assumed the risk when he walked up to [the Spaceball] that if he wasn't strapped in properly that he would fall and hit his head. And so there's no evidence to support a claim against my client ...
While Fiesta argued its case on the assumption of risk issue, it brought up Coomer and told the trial court that whether Respondent assumed the risk was a question of law for the court to decide, not the jury. Fiesta contends that the trial court erred by not ruling on whether Respondent's injuries resulted from a risk inherent in riding the Spaceball, but we disagree. The court rejected the idea that there is an inherent risk in riding amusement park rides-such as the Spaceball-that would bar companies from being sued for negligence. The court noted that if one were to accept Fiesta's argument, then "nobody could ever sue Six Flags." Even if the rides at Six Flags were carelessly operated, Six Flags would be shielded from *128 liability in the scenario presented by Fiesta, as the injured party would have "assumed the risk" of injury by getting on the ride. Applying Fiesta's interpretation of the term "inherent risk," the risk of falling from a ride (and being improperly secured to experience the ride) would be "inherent" in partaking in the activity and the company would owe no duty of care to the patron, thereby acting as a complete bar to negligence under the implied primary assumption of risk doctrine. See id. at 192. The trial court concluded, "I appreciate the assumption of risk argument. But I think that it doesn't apply here under these facts. So that will be my ruling." We agree with the trial court.
Although it is logical to conclude that riding the Spaceball without being properly secured is inherently dangerous, there is no "inherent risk" in the "constitution or essential character" of the ride, which comes equipped with safety harnesses that prevent the alleged risks when properly applied. Moreover, any risk "inherent" in riding the Spaceball would be increased by Fiesta's failure to prevent the use of the Spaceball or provide the assistance of trained individuals to ensure riders were properly secured into the ride.
Argument Two: Inherent Risk of Riding the Spaceball
We also disagree with how Fiesta defines inherent risk in the present context. Fiesta argues: "[r]otating and becoming inverted is part of the 'essential character' of the Spaceball. It follows that the risk of becoming inverted on the Spaceball is inherent in the ride, and it is axiomatic that a risk exists that a rider will be jettisoned from the Spaceball if he is not secured to the Spaceball."
The relevant question in this case is whether there is an inherent risk of falling out of the Spaceball and sustaining injury. Fiesta seems to suggest the appropriate inquiry here is whether there is an inherent risk in riding the Spaceball under the circumstances in which the participant is aware of the fact he or she is relying on untrained individuals to secure him or her to the ride. Under Fiesta's inquiry, the assumption is made that Respondent was aware of the fact he was secured to the ride by untrained individuals and voluntarily opted to ride the Spaceball despite this knowledge of increased risk. Whether Respondent was aware that he was harnessed by untrained individuals is a question of fact, and in this case, an assertion that Respondent unequivocally denied. On direct, Respondent testified that he assumed the people strapping him in "knew what they were doing." Respondent's subjective knowledge or awareness of the bystanders' experience operating the Spaceball is only relevant to determining if Respondent was partially at fault, as the risk of being poorly secured by inexperienced individuals is a secondary risk that is not inherent in riding the Spaceball. Id. at 195 n.7.
We turn to Sheppard by Wilson v. Midway R-1 Sch. Dist. , 904 S.W.2d 257, 259 (Mo. App. W.D. 1995) to help highlight the differences between primary and secondary risks. In Sheppard by Wilson , the plaintiff was injured while competing in a high school long jump competition. The plaintiff presented evidence to support her theory that the injury was caused by the defendant's negligent maintenance of its sandpits (i.e., the jumper's landing spot). Id. at 264. The plaintiff argued the pit was wet, muddy, inadequately filled with sand, and not properly raked between jumps. Id. at 259. The defendant argued the plaintiff was aware of the risk because she had practiced using the pit before the injury and she observed the conditions of the pit. Id. at 259. The court noted that these *129 observations may show that she "unreasonably assumed the risk of injury in the secondary sense," but it was not relevant to evaluating if the risk was inherent. See id. at 264. The Western District explained that some risks, such as "an awkward or bad landing," are inherent risks of long jumping. Id. at 264. Unlike a primary assumption of risk, a secondary assumption of risk "is to be considered one element of fault to be compared by the jury." Id. at 262. Thus, "even though the student [could not] sue under implied primary assumption of the risk for injuries resulting from inherent risk of a bad landing in [a] high school long-jump contest, the jury [could have held] the school district liable when the inherent risk of a bad landing was altered or increased by defendant's negligence in preparing the landing pit and this negligence caused the student's injuries.". Coomer , 437 S.W.3d at 198 (citing Sheppard by Wilson , 904 S.W.2d at 263-64 ).
Turning back to the case at bar, the lack of supervision over the Spaceball and the inadequately secured harness were not inherent in the activity of riding the Spaceball. These circumstances are more akin to the alleged conditions of the pit in Sheppard . Similar to the risk of sustaining injury from an awkward landing from long jumping, there are likely other inherent risks involved in riding the Spaceball-such as suffering from nausea or dizziness. However, the inadequate oversight and improper application of the harnesses and subsequent fall are not "inherent" in riding the Spaceball. Like in Sheppard , the relevant question here is whether the defendant increased the risk of or caused the plaintiff's injury by its negligence. Sheppard by Wilson , 904 S.W.2d at 263. Clearly, Respondent's risk of injury drastically increased when Fiesta failed to ensure trained individuals would help operate the Spaceball and/or Fiesta failed to intervene when it noticed the Spaceball was being used by untrained patrons. Thus, the trial court appropriately concluded that implied primary assumption of risk was inapplicable and could not preclude Respondent from recovery.
Fiesta could have (and did) argue Respondent was at least partially at fault for not being more aware of the risk, such as failing to inquire if the bystanders were experienced in securing passengers on the ride, but that only goes to Respondent's comparative fault, which should be presented to the jury for resolution. See Coomer , 437 S.W.3d at 194 ("[W]hen the plaintiff is injured by the defendant's negligence, this Court holds that the adoption of comparative fault in [ Gustafson v. Benda , 661 S.W.2d 11, 13 (Mo. banc 1983) ] precludes any consideration of the plaintiff's conduct in assuming that risk (i.e., implied secondary assumption of the risk) except as a partial defense under a proper comparative fault instruction." In this case, a comparative fault instruction was properly submitted to the jury, but the jury returned a verdict apportioning 100% of the fault to Fiesta.
Argument Three: Implied Assumption of Risk Due to Respondent's Awareness of Risk
Fiesta argues that Respondent assumed the risk of falling and suffering injury because Respondent admitted he was aware of the fact that falling from the ride would be dangerous. This selective truncation of testimony does not tell the whole story. Basically, Respondent made an obvious statement that if he were to fall from the ride, he was aware it would likely result in injury. When pressed on the issue by Fiesta's counsel, Respondent explained what he meant when he said he assumed the risk of falling if he was not properly strapped into the ride:
*130 I mean, you assume risk laying in bed at night. You assume risk driving down a highway. You assume risk going to work. You assume risk going through the drive-thru. You assume risk in every avenue and every aspect of life.
In other words, Respondent testified that he was aware of everyday risks we all face; at no point in Respondent's testimony does he suggest he was aware of and assumed the risk that he would not be properly secured and could suffer injury as a result. To the contrary, Respondent testified that he assumed the two people helping secure him with the harness "worked there"; he did not think they were untrained bystanders. He also testified he had never met the two bystanders before that night, bolstering his testimony that he did not know the bystanders were not qualified to help secure him to the ride. Thus, although Respondent was aware that falling from the ride would likely result in injury, he did not believe there was an appreciable risk of falling, because he believed he was properly secured by two individuals he assumed were trained to operate the Spaceball. Respondent even testified that he checked the harness himself and he felt he was securely and correctly strapped in.
Nothing on the record is sufficient to establish Respondent impliedly assumed the risk of injury; at best, there is precious little evidence to establish Respondent voluntarily rode the Spaceball while having knowledge of the heightened chance of injury due to untrained individuals applying his safety harness.
Based on the foregoing, we deny Point IV.
e. Points V & VI-Motions for Remittitur and New Trial Based on an Excessive Verdict
Because Fiesta's argument under Point VI is based on the "[same] reasons set forth in Point V," we will address both points together. The crux of Fiesta's arguments under both points is that the jury's award was manifestly unjust, unsupported by the evidence, and resulted from multiple erroneous trial court rulings.
i. Standard of Review for Points V and VI
The purpose of compensatory damages is to fairly and reasonably compensate a plaintiff for his or her injury. Stewart v. Partamian , 465 S.W.3d 51, 56 (Mo. banc 2015) ; see also Poage , 523 S.W.3d at 523 ("We generally use the amount of compensatory damages awarded as a proxy for the [injury] caused by the defendant."). "Generally, the determination of damages is primarily for the jury." Blanks v. Fluor Corp. , 450 S.W.3d 308, 407 (Mo. App. E.D. 2014) (citing Emery v. Wal-Mart Stores, Inc. , 976 S.W.2d 439, 448 (Mo. banc 1998) ). Additionally, we afford the trial court broad discretion in deciding whether remittitur should be ordered; we review this decision using an abuse of discretion standard, and we will only interfere with the jury's verdict if the award is "so grossly excessive that it shocks the conscience of the court and convinces us that both the trial judge and the jury have abused their discretion." Id. at 408 (citing Emery , 976 S.W.2d at 448 ).
In assessing whether the trial court abused its discretion by permitting an excessive award of damages, we only consider the evidence supporting the verdict, disregarding any evidence to the contrary. Delacroix , 407 S.W.3d at 36. In fact, if a trial court approves a jury's verdict, "its discretion is practically conclusive." Id. ; see also Stewart , 465 S.W.3d at 57 ("Appellate review of a jury's verdict begins with the recognition that the jury retains virtually unfettered discretion in reaching its decision because there is a *131 large range between the damage extremes of inadequacy and excessiveness.").
"There are two general types of excessive verdicts: (1) a verdict that is disproportionate to the evidence of injury and results from an 'honest mistake' by the jury in assessing damages; and (2) a verdict that is excessive due to trial error that causes bias and prejudice by the jury." Stewart , 465 S.W.3d at 56. In the present case, Fiesta argues that the excessive verdict was a result of both of these "general types of excessive verdicts." Nonetheless, there is an important distinction between excessive verdicts caused by "honest mistake" of the jury and those resulting from "prejudice by the jury" that stem from the trial court's errors. A finding that the verdict is excessive due to "honest mistake" by the jury may be cured by ordering remittitur or granting a new trial. Id. However, if we find that an excessive verdict resulted from trial error that caused jury prejudice, a new trial must be held; simply ordering remittitur is not an option. Id.
"No precise formula exists to determine whether a verdict is excessive," and the inquiry is fact-specific. Blanks , 450 S.W.3d at 408. Moreover, "[t]he range between an inadequate award and an excessive award for pain and suffering can be enormous and substantial disparity among juries as to what constitutes pain and suffering must be expected." Delacroix , 407 S.W.3d at 37. However, to help guide the analysis, Missouri courts consider a number of factors for determining whether an award is excessive: "(1) loss of income, both present and future; (2) medical expenses; (3) plaintiff's age; (4) the nature and extent of plaintiff's injuries; (5) economic considerations; (6) awards given and approved in comparable cases; and (7) the superior opportunity for the jury and the trial court to evaluate plaintiff's injuries and other damages." Emery , 976 S.W.2d at 448. Additionally, the jury is allowed to consider intangible or non-economic damages, such as "past and future pain, suffering, effect on life-style, embarrassment, humiliation, and economic loss." Stewart , 465 S.W.3d at 57.
ii. Evidence of Damages Presented at Trial
During the course of the trial, the following evidence of Respondent's pain and suffering and future medical treatment was adduced:
• Respondent testified that he was an active, relatively healthy 28 year old at the time of his injury (and 32 years old at the time of the trial), but the injury has prevented him from doing certain things he was able to do previously.
• Respondent testified that his job requires some manual labor and he now has to enlist the help of his co-workers to perform certain tasks, which had never happened prior to falling from the Spaceball. Respondent's testimony was corroborated by the deposition testimony of Bobby Wayne Spurlock, who was a co-worker of Respondent.
• Respondent also testified that his injury prevents him from doing certain activities with his children due to his pain and the fear of further injuring his neck.
• Additionally, Respondent testified that he has not had full range of motion in his neck since the fall.
• Although the fracture has "healed," Respondent testified that he still had pain at the time of the trial.
• Dr. Brancato, Fiesta's expert witness, testified that he performed an independent medical examination on *132 Respondent. The examination took place in Fiesta's attorney's conference room over the span of 45 minutes to an hour. Dr. Brancato testified that his report stated that Respondent's "persistent subjective complaints [of pain] are likely related to [the Spaceball] incident."
• Wife testified that the injury impaired Respondent's ability to sleep, especially in the summer, stating "He doesn't sleep. And that has happened since the accident. He's very restless because he never gets any sleep."
• Wife also testified that the injury has changed Respondent and affected his relationship with his family. For example, Wife testified, "I know immediately whenever he's in pain because he's just, I guess, spacey if-I don't know really how to explain it. He's just not there ..." Wife also testified that Respondent becomes angrier much more quickly now, and at times, he gets upset with her or the children for no apparent reason.
iii. Analysis on Points V and VI
Fiesta contends that the trial court erred in denying its motion for new trial and/or remittitur because "the verdict is excessive and unsupported by the evidence of Respondent's alleged pain and suffering and because this excessive verdict resulted from multiple trial errors."
First, Fiesta notes that the amount awarded by the jury ($1,500,000) exceeds the amount suggested by Respondent's counsel during closing arguments ($500,000-$750,000), which supports its assertion that the verdict was excessive. Fiesta argues that the verdict was excessive and a result of the jury's bias or prejudice. As the Western District and the Supreme Court of Missouri have noted, there have been a "legion of cases" in Missouri where a plaintiff receives a jury award greater than she suggests in personal injury cases and the award is not deemed "excessive." Goudeaux v. Bd. of Police Com'rs of Kansas City , 409 S.W.3d 508, 521 (Mo. App. W.D. 2013) ; Stewart , 465 S.W.3d at 58. Moreover, jury verdicts exceeding a suggested award amount are more common when "the damages sought inherently involve an element of subjective calculation, as is the case with pain and suffering." Stewart , 465 S.W.3d at 58.
In Stewart , the plaintiff's counsel suggested a total verdict of $3,377,366, and the jury returned a verdict for $4,300,000-nearly $1,000,000 higher than the suggested award. Id. at 57. The Supreme Court of Missouri concluded that "[t]he jury's decision to award a greater amount of damages than suggested by [the plaintiff's counsel's] closing argument does not establish that the verdict was excessive," and it found the trial court did not abuse its discretion in denying the defendant's motion for a new trial. Id. at 58. Thus, even though the jury verdict exceeded the award amount suggested by Respondent's counsel, that alone falls far short of showing the trial court abused its discretion by failing to find that the verdict was excessive due to the jury's passion and prejudice. See id. at 56 ("The amount of the verdict does not by itself establish bias or passion and prejudice without showing some other error was committed during the trial.").
Fiesta also argues that the verdict was unsupported by the evidence (i.e., the jury made an "honest mistake" in rendering an excessive verdict, which the court may remedy by ordering remittitur or granting a new trial). We disagree. Fiesta claims the damages Respondent allegedly suffered from his fall were "minimal" and "the undisputed evidence established that *133 [Respondent] enjoyed the same lifestyle after his fall from the Spaceball as he did before." The record clearly contradicts the second allegation, and an assessment of the severity of Respondent's damages is a question of fact, which the trial court and jury are in much better position to perform. Based on the damages assessed by the jury, it is clear the jury found Respondent's damages to be substantially greater than "minimal."
At its core, this case was based on the pain and suffering of Respondent. The jury was in a much better position to assess the extent of pain and suffering Respondent had endured and likely will endure in the future, as it heard the testimony of Respondent and Wife, among other witnesses. See Emery , 976 S.W.2d at 448 (explaining the jury's "superior opportunity" to evaluate the plaintiff's injuries and damages is a factor in determining if an award is "excessive"). Witnesses testified about the amount of physical pain Respondent felt, his inability to partake in certain activities due to the injury, and the extensive treatment Respondent would require throughout his lifetime to minimize-although not completely alleviate-the effects from his fall.
The jury was able to observe the witnesses to assess their credibility, which is something this Court cannot do. Moreover, there was no evidence that Respondent's pain-which has persisted for years-would likely stop in the future, and Respondent was only 32 years old at the time of his trial. It is incredibly difficult to assign a value to Respondent's burden of enduring this pain and being prevented from living his life as he would absent the injury, such as his ability to play with his children and perform certain work. The jury's assessment of damages is "practically conclusive," and its award will only be disturbed if it is "so grossly excessive that it shocks the conscience of the court and convinces us that both the trial judge and the jury have abused their discretion." Blanks , 450 S.W.3d at 408 ; Delacroix , 407 S.W.3d at 36. After considering all of the evidence supporting the award, weighing all relevant factors, and giving due deference to the jury's and trial court's ability to evaluate the credibility of the witnesses who testified as to the amount of pain and suffering Respondent will likely endure throughout his life, we cannot say the trial court abused its discretion in denying Fiesta's motions for remittitur and/or new trial based on an allegedly excessive verdict. Points V and VI are denied.
Conclusion
Based on the foregoing, we affirm the judgment of the trial court.
Mary K. Hoff, J., concurs.
Lisa S. Van Amburg, J., concurs.

All statutory citations are to RSMo 2000 as updated through the most recent cumulative supplement, unless otherwise indicated.

We note that prior to the amendment to § 490.065 that became effective on August 28, 2017, the section governed the admissibility of expert witness testimony "[i]n any civil action." However, "[i]n any civil action" has been replaced by "[i]n actions brought under chapter 451, 452, 453, 454, or 455 or in actions adjudicated in juvenile courts under chapter 211 or in family courts under chapter 487, or in all proceedings before the probate division of the circuit court, or in all actions or proceedings in which there is no right to a jury trial[.]"

Respondent argues that even if the testimony should have been excluded, there would be no reversible error, as Respondent's testimony could serve as a basis for establishing causation under the "sudden onset" doctrine. However, since we find the trial court did not err in admitting Dr. Levy's testimony, we do not address the merits of this argument.

After Missouri adopted comparative fault in Gustafson v. Benda , 661 S.W.2d 11, 13 (Mo. banc 1983), the idea of implied secondary assumption of risk has been relevant only to the extent it establishes the plaintiff was partially at fault for an injury, which a jury considers under a comparative fault instruction. Coomer , 437 S.W.3d at 194. ("[T]he affirmative defense aspect of assumption of the risk, i.e., implied secondary assumption of the risk, did not survive the advent of comparative fault [in Gustafson ]. Once the jury finds that the defendant was negligent, Gustafson prohibits any further inquiry into the reasonableness or unreasonableness of the plaintiff's conduct as a basis for barring the plaintiff's claim entirely.").