

# In the Missouri Court of Appeals
# Eastern District

## <u>DIVISION ONE</u>

CHRISTINA BOJORQUEZ,       )        No. ED107858
      )
    Respondent,       )
      )        Appeal from the Circuit Court
    vs.       )        of St. Louis County
      )        16SL-CC01088
THOMAS E. O'KEEFFE, D.D.S.,       )
A PROFESSIONAL CORPORATION, and       )        Honorable Stanley J. Wallach
THOMAS E. O'KEEFFE, D.D.S.,       )
      )
    Appellants.       )        Filed: July 7, 2020

Thomas E. O'Keeffe, D.D.S., a professional corporation, and Thomas E. O'Keeffe,

D.D.S. (individually "Defendant O'Keeffe" or "Dr. O'Keeffe") (collectively "Defendants"),

appeal the judgment entered upon a jury verdict in favor of Christina Bojorquez ("Plaintiff") on

her dental malpractice claim. In accordance with the jury's verdict, the trial court's judgment

awarded Plaintiff a total of $2.5 million in noneconomic damages on Plaintiff's claim alleging,

*inter alia*, that Plaintiff suffered damages as a result of Defendant O'Keeffe lacerating her tongue

with a dental drill during a crown preparation procedure. We affirm.

# I.    BACKGROUND

## A.    Relevant Evidence Presented at Plaintiff's Jury Trial

A jury trial took place on Plaintiff's dental malpractice claim from January 14-17, 2019. Viewing all the evidence and reasonable inferences that can be drawn therefrom in the light most favorable to Plaintiff,[1] the evidence presented at Plaintiff's trial revealed the following.

Plaintiff is a native of Tucson, Arizona and a twenty-year veteran of the United States Navy. When Plaintiff was not on active duty with the Navy, she worked for the City of Tucson in various capacities.

In 2012, Plaintiff was on active duty with the Navy and she was assigned to the National Personnel Records Center in St. Louis. Plaintiff began treating with Dr. O'Keeffe in July 2012.

### 1.    Defendant O'Keeffe's Laceration of Plaintiff's Tongue

On October 9, 2012, Plaintiff, then about 51 years old, visited Dr. O'Keeffe for a crown preparation procedure to be performed on one of Plaintiff's teeth. As is standard with this type of procedure, Plaintiff's tooth, tongue, and side of her mouth were numbed so her tooth could be tapered on all sides with the use of a dental drill.

Dr. O'Keeffe used a hand mirror to attempt to protect Plaintiff's tongue during the crown preparation procedure. However, during the course of the procedure, Dr. O'Keeffe lacerated Plaintiff's tongue with the dental drill, which was rotating at 220,000 revolutions per minute and was tipped with a diamond burr bit. The laceration was approximately a centimeter-and-a-half long and one-centimeter deep.

---

[1] *See Huelskamp v. Patients First Health Care, LLC*, 475 S.W.3d 162, 168 (Mo. App. E.D. 2014) and *Tompkins v. Kusama*, 822 S.W.2d 463, 464 (Mo. App. E.D. 1991) and *Pettet v. Bieterman*, 718 S.W.2d 188, 189 (Mo. App. S.D. 1986) and *Yoos v. Jewish Hosp. of St. Louis*, 645 S.W.2d 177, 183 (Mo. App. E.D. 1982) (set forth in Section II.A.1. of this opinion and providing part of the standard for reviewing, *inter alia*, a trial court's denial of a motion for judgment notwithstanding the verdict, which is one of the trial court's rulings Defendants request this Court to review on appeal).

Before Plaintiff left Dr. O'Keeffe's office, he never informed her that he had cut her tongue. And because Plaintiff's tongue was numb, Plaintiff was unaware Dr. O'Keeffe had lacerated her tongue until after she left the office and looked inside her mouth in the rear-view mirror of her car. Plaintiff testified that when she saw her tongue in the mirror, it "was chopped up" and "looked like hamburger." She then returned to Dr. O'Keeffe's office. At this point, Dr. O'Keeffe sent Plaintiff to a local oral surgeon, Dr. Scott F. Nolen. Dr. Nolen saw Plaintiff immediately and sutured her tongue.

### 2. Plaintiff's Subsequent Treating Health Care Professionals

Plaintiff returned to Dr. Nolen for two more visits – one three days after her injury and one ten days after her injury – and during both of those times she was still having problems speaking. Plaintiff then saw Dr. Anne Steward for completion of the crown, who was "shocked" by Plaintiff's condition and who was also concerned about Plaintiff's slurred speech.

Plaintiff subsequently saw several physicians in St. Louis for treatment. On December 4, 2012, Plaintiff was seen by Dr. Paul Burk, an ear, nose and throat surgeon. Dr. Burk recommended Plaintiff undergo speech therapy, which she did from December 10, 2012 to January 25, 2013, attending all visits as ordered. While there was some improvement in her speech during this timeframe, it did not return to normal.

Dr. Burk recommended Plaintiff see a neurologist, Dr. Daniel Mattson. Plaintiff saw Dr. Mattson on March 4, 2013. During the visit, Dr. Mattson ruled out that Plaintiff had suffered a stroke and recommended counseling, telling Plaintiff her altered speech was "in [her] head." Plaintiff did not undergo this counseling, instead deciding to seek treatment with other doctors because she was upset and believed Dr. Mattson was conveying to her that her speech problem was not related to a real, physical injury. The counseling recommendation by Dr. Mattson is the only recommendation or treatment declined by Plaintiff from the time she was injured in October

3

2012 until the time of trial in January 2019. Furthermore, other than Dr. Mattson's counseling recommendation, Plaintiff saw every physician recommended to her, attended every visit that was scheduled, and completed every course of speech therapy that was prescribed.

On April 22, 2013, Plaintiff was seen by Dr. Randal C. Paniello at Washington University in St. Louis, an ear, nose and throat surgeon with a specialization in voice disorders. After examining Plaintiff, Dr. Paniello concluded Plaintiff had a voice disorder and the most likely explanation for the disorder was that Plaintiff had sustained a partial injury to the twelfth cranial nerve in her tongue.[2] Dr. Paniello noted during his examination of Plaintiff that her tongue was moving in an uncoordinated manner, which would be consistent with a partial injury to the twelfth cranial nerve. Dr. Paniello also opined the location of the scar on Plaintiff's tongue was consistent with an injury to the twelfth cranial nerve.

Dr. Paniello recommended Plaintiff undergo additional speech therapy with speech pathologist Dr. Archie B. Harmon at Washington University. Plaintiff underwent speech therapy with Dr. Harmon from April 22, 2013 through June 13, 2013, completing every session. At the conclusion of this therapy, Dr. Harmon opined, (1) Plaintiff had improved and was approximately thirty to forty percent intelligible; but (2) Plaintiff had plateaued and was not going to be able to improve further. Because Dr. Harmon opined Plaintiff would not benefit or regain her prior level of speech function from any other speech therapies, Dr. Harmon did not recommend any future therapy. Dr. Harmon also testified it was his opinion that Plaintiff's speech issues were related to a nerve injury.

Following Plaintiff's treatment at Washington University, Plaintiff saw a variety of different specialists through the Veterans Affairs ("the VA") in San Diego when she underwent a fitness for duty exam and then in Tucson. Consistent with the opinions of Dr. Paniello and Dr.

---

[2] The twelfth cranial nerve of the tongue, also known as the hypoglossal nerve, assists in the movement of the tongue.

Harmon, some of the VA specialists Plaintiff saw opined she had a twelfth cranial nerve injury consistent with a tongue laceration.

However, at least one of the VA specialists, a speech therapist, opined Plaintiff had a conversion disorder[3] as opposed to a nerve injury. Plaintiff's medical records with the VA speech therapist dated October 21, 2014 provide in pertinent part: "[i]t is likely that the initial injury caused pain/discomfort causing [Plaintiff] to alter her tongue posture, tongue movements, and even jaw movement in an attempt to minimize the pain while trying to verbally communicate her messages"; and "[c]ombined with the emotional stress of having sustained such an injury likely contributed to the rapid seeding of a new speech pattern that is characterized by extreme tension in the jaw and tongue, altered speech rate and posturing contributing to speech distortions . . .."

### 3. Additional Evidence

One of Plaintiff's experts, dentist Dr. Charles Fuszner, testified he opined Defendant O'Keeffe breached the standard of care by, (1) lacerating Plaintiff's tongue with the dental drill during the crown preparation procedure; and (2) failing to be aware of alternative methods of protecting the tongue and utilizing them when he felt the hand mirror he used on Plaintiff was not working.

It is undisputed the evidence at trial showed Plaintiff did not have a speech problem or voice disorder prior to Defendant O'Keeffe's laceration of Plaintiff's tongue. It is also undisputed the evidence demonstrated that as of the time of the trial, Plaintiff spoke with a very notable articulation/voice disorder despite completing every round of speech therapy that was prescribed.

---

[3] A conversion disorder is an involuntarily altered speech pattern which can follow a painful injury, in which a person will alter tongue posture, tongue movements, and jaw movements in an attempt to minimize the pain while trying to verbally communicate.

Additionally, there was significant amount of evidence presented at trial demonstrating, (1) Plaintiff's injuries and resulting voice disorder have caused her pain and suffering, impacted her lifestyle, and caused her embarrassment and humiliation; and (2) Plaintiff will continue to suffer such noneconomic damages in the future.

Finally, Defendants presented testimony from their experts indicating Plaintiff had a conversion disorder rather than a nerve injury.

**B.      Relevant Procedural Posture**

After the close of Plaintiff's evidence and at the close of all of the evidence, Defendants moved for a directed verdict on the issue of causation, and the trial court denied the motions.

During closing argument, Plaintiff invited the jury to find Defendants' liable for dental malpractice if there was sufficient evidence as to two wholly separate theories of liability: (1) a nerve damage theory of liability alleging Defendant O'Keeffe's negligent conduct of lacerating Plaintiff's tongue with the dental drill caused an injury to the twelfth cranial nerve in Plaintiff's tongue that in turn, caused her voice disorder; and (2) a conversion disorder theory of liability alleging Defendant O'Keeffe's negligent conduct of lacerating Plaintiff's tongue with the dental drill caused her to suffer a conversion disorder that in turn, caused her voice disorder.

The jury returned a general verdict in favor of Plaintiff, awarding her a total of $2.5 million in noneconomic damages ($500,000 in past noneconomic damages and $2 million in future noneconomic damages). The verdict director did not ask the jury to differentiate between Plaintiff's two theories of liability discussed above.

After the trial court entered a judgment in accordance with the jury's verdict, Defendants filed a post-trial motion for judgment notwithstanding the verdict ("JNOV"), and in the alternative, for a new trial or remittitur. Defendants' post-trial motion alleged Plaintiff failed to make a submissible case on causation, the jury's award of $2.5 million in noneconomic damages

6

should be reduced pursuant to section 538.210 RSMo 2016, and the jury's verdict awarding Plaintiff $2.5 million in noneconomic damages should be remitted on the grounds the award was excessive. After Plaintiff filed a response, the trial court denied Defendants' post-trial motion. Defendants' appeal.[4]

## II.    DISCUSSION

Defendants raise three points on appeal arguing, (1) the trial court erred in denying their motion for JNOV because Plaintiff failed to present a submissible case of dental malpractice on the issue of causation; (2) the trial court erred in failing to reduce the jury's award of $2.5 million in noneconomic damages pursuant to the limits on noneconomic damages set forth in section 538.210 RSMo 2016; and (3) the trial court erred in failing to remit the jury's verdict awarding Plaintiff a total of $2.5 million in noneconomic damages on the grounds the award was excessive.

## A.    Whether the Trial Court Erred in Denying Defendants' Motion for JNOV

In Defendants' first point on appeal, they contend the trial court erred in denying their motion for JNOV because Plaintiff failed to present a submissible case of dental malpractice on the issue of causation. For the reasons discussed below, we disagree.

### 1.    Standard of Review

In reviewing a trial court's denial of a defendant's motion for JNOV, our Court must determine whether the plaintiff made a submissible case, i.e., whether the plaintiff "presented substantial evidence for every fact essential to liability." *Huelskamp v. Patients First Health Care, LLC*, 475 S.W.3d 162, 168 (Mo. App. E.D. 2014) (quotations omitted). In ascertaining whether a plaintiff made a submissible case, we view all evidence and reasonable inferences that can be drawn therefrom in the light most favorable to the plaintiff, and we disregard all contrary

---

[4] To avoid unnecessary repetition, additional evidence and procedural posture will be set forth in relevant part in our discussion of Defendants' points on appeal in Section II. of this opinion.

7

evidence and inferences.[5] *Id.*; *Tompkins v. Kusama*, 822 S.W.2d 463, 464 (Mo. App. E.D. 1991); *Pettet v. Bieterman*, 718 S.W.2d 188, 189 (Mo. App. S.D. 1986); *Yoos v. Jewish Hosp. of St. Louis*, 645 S.W.2d 177, 183 (Mo. App. E.D. 1982). Finally, a trial court's denial of a defendant's motion for JNOV will be reversed on appeal "only if there is a complete absence of probative facts to support the jury's conclusion." *Huelskamp*, 475 S.W.3d at 168 (quoting *Keveney v. Missouri Military Academy*, 304 S.W.3d 98, 104 (Mo. banc 2010)).

2.      **General Law Regarding the Elements of Dental Malpractice and Causation**

In order to make a submissible case of dental malpractice, a plaintiff must prove, (1) an act or omission of the defendant fell below the requisite medical standard of care; (2) the defendant's act or omission was performed negligently; and (3) there is a sufficient causal connection between the negligent act or omission and the plaintiff's injuries. *Blake v. Irwin*, 913 S.W.2d 923, 926, 928 (Mo. App. W.D. 1996).[6]

With respect to causation, which is the only element at issue in this point on appeal, a plaintiff is required to prove the defendant's negligent conduct was "both the cause in fact and the proximate or legal cause of [the plaintiff's] injuries." *Huelskamp*, 475 S.W.3d at 168 (quotations omitted). To establish the "cause in fact" prong of the element of causation, otherwise known as "but for" causation, a plaintiff must show that but for the defendant's negligent conduct, the plaintiff's injuries would not have occurred. *Id*. at 168-69. In other

---

[5] This principle of law governing our standard of review will be expounded upon further in Section II.A.3. of this opinion, because it is relevant to our analysis of Defendants' argument concerning expert testimony and causation and what Missouri law requires with respect to those issues.

[6] At this juncture, we note the same principles of law governs both dental and medical malpractice actions. *Compare, e.g., Blake*, 913 S.W.2d at 926, 928 (setting forth what is required to make a submissible case of dental malpractice and applying medical malpractice law to a dental malpractice action) *with Tompkins*, 822 S.W.2d at 464 (similarly setting forth what is required to make a submissible case of medical malpractice); *see also* section 516.105 RSMo Supp. 2005 (effective from August 28, 2005 to August 27, 2016) (providing the statute of limitations is the same for, *inter alia*, "[a]ll actions against physicians, hospitals, dentists, [and] registered or licensed practical nurses"). Accordingly, although many of the cases cited to in this opinion involve medical malpractice actions, the principles of law therein apply to dental malpractice actions including the one at issue in the instant appeal. *See, e.g., Huelskamp*, 475 S.W.3d at 168-69 and *Tompkins*, 822 S.W.2d at 464 and *Pettet*, 718 S.W.2d at 189 and *Yoos*, 645 S.W.2d at 183 (all medical malpractice actions).

words, the plaintiff must show the defendant caused or contributed to cause the plaintiff's injuries. *See Lowe v. Mercy Clinic East Communities*, 592 S.W.3d 10, 18-19, 18 n.4 (Mo. App. E.D. 2019); *Huelskamp*, 475 S.W.3d at 168-71.

To establish the "proximate cause" prong of causation, a plaintiff must show her injuries were "the natural and probable consequence" of the defendant's negligent conduct. *Id*. at 169. "To the extent the damages are surprising, unexpected, or freakish, they may not be the natural and probable consequences of a defendant's actions." *Sanders v. Ahmed*, 364 S.W.3d 195, 210 (Mo. banc 2012) (quotations omitted).

We now turn to Defendants' argument concerning expert testimony and causation.

### 3. Analysis of Defendants' Argument Concerning Expert Testimony and Causation and What Missouri Law Requires with Respect to those Issues

On appeal, Defendants argue that when proof of causation requires a certain degree of expertise, a plaintiff in a dental malpractice action is required to present testimony *from her own expert* to make a submissible case of causation. In support of this argument, Defendants rely on an isolated sentence from *Sanders* and *Sundermeyer*, which provides, "[i]n a medical malpractice case, where proof of causation requires a certain degree of expertise, the plaintiff must present expert testimony to establish causation." *Sanders*, 364 S.W.3d at 208 (quoting *Sundermeyer v. SSM Regional Health Services*, 271 S.W.3d 552, 554 (Mo. banc 2008)).

Contrary to Defendants' interpretation of the preceding language in *Sanders* and *Sundermeyer*, we do not read it to require a plaintiff to present expert testimony from her own expert to establish causation. *See id*. Similarly, we do not construe the language to require a plaintiff to present expert testimony during her case-in-chief. *See id*.

Instead, when considered in the context of our standard for reviewing a motion for JNOV, we hold the aforementioned language of *Sanders* and *Sundermeyer*, *see id*., merely requires a plaintiff to establish causation with expert testimony where proof of causation requires

9

a certain degree of expertise, and that testimony can be from the plaintiff's or defendant's expert(s) insofar as it aids the plaintiff in making a submissible case. *See Tompkins*, 822 S.W.2d at 464 and *Pettet*, 718 S.W.2d at 189 and *Yoos*, 645 S.W.2d at 183 (three medical malpractice cases providing our standard of review requires "*all* the evidence [to] be viewed in the light most favorable to the plaintiff [ ], giving [her] the benefit of all favorable inferences") (emphasis added); *id.* and *Rauschelbach v. Benincasa*, 372 S.W.2d 120, 121, 125 (Mo. 1963) and *Cignetti v. Camel*, 692 S.W.2d 329, 334 (Mo. App. E.D. 1985) (five medical malpractice cases collectively holding our standard of review requires an appellate court to "disregard [ ] [the] defendant's evidence, except insofar as it might be favorable to [the] plaintiff [ ]," i.e., "except as it may aid [the] plaintiff ['s] case").

Finally, we note Missouri law also provides that when expert testimony is required to establish causation because proof of causation requires a certain degree of expertise, such testimony must be given within a reasonable degree of medical certainty. *Watson v. Tenet Healthsystem SL, Inc.*, 304 S.W.3d 236, 240 (Mo. App. E.D. 2009) (citing *Sundermeyer*, 271 S.W.3d at 554-56).

### 4.  Analysis as to Whether Plaintiff Made a Submissible Case on the Issue of Causation

We now turn to whether, in light of the above standard of review and applicable law, Plaintiff made a submissible case on the issue of causation.

#### a.  Relevant Background

At trial, Plaintiff invited the jury to find Defendant O'Keeffe's negligent conduct of lacerating Plaintiff's tongue with a dental drill caused Plaintiff's voice disorder under two wholly separate theories:  a nerve damage theory of liability and a conversion disorder theory of liability.  It is undisputed that during Plaintiff's case-in-chief, Plaintiff presented sufficient evidence through the testimony of two of her experts, Drs. Paniello and Harmon, supporting a

nerve damage theory of liability which established Defendant O'Keeffe's negligent conduct of lacerating Plaintiff's tongue with a dental drill caused an injury to the twelfth cranial nerve in Plaintiff's tongue that in turn, caused her voice disorder.[7]

After the close of Plaintiff's evidence, Defendants presented testimony from their experts attempting to disprove Plaintiff's nerve damage theory of liability and indicating Plaintiff's voice disorder was instead caused by a conversion disorder.[8] Subsequently, during closing argument, Plaintiff invited the jury to find Defendants' liable for dental malpractice if there was sufficient evidence as to two wholly separate theories of liability: (1) the nerve damage theory of liability explained above; or (2) the conversion disorder theory of liability alleging that Defendant O'Keeffe's negligent conduct of lacerating Plaintiff's tongue caused her to suffer a conversion disorder that in turn, caused her voice disorder.

The parties agree that based on the above procedural posture, and because the jury returned a general verdict of liability on a verdict director which did not ask the jury to differentiate between the two theories of liability raised at trial, Plaintiff was required to make a submissible case of causation on each theory of liability, i.e., the nerve damage theory of liability and the conversion disorder theory of liability. *See Coggins v. Laclede Gas Co.*, 37 S.W.3d 335, 342 (Mo. App. E.D. 2000) ("[w]here two or more theories of liability are submitted to the jury and one of the theories of submission is found to be defective, a new trial must be granted if the jury returned a general verdict of liability") (citing *M.C. v. Yeargin,* 11 S.W.3d 604, 611 (Mo. App. E.D .1999) (abrogated on other grounds)); *see also Richey v. Philipp*, 259 S.W.3d 1, 12 n.2 (Mo. App. W.D. 2008) ("[i]f we determine that [the plaintiff] failed to make a submissible case

---

[7] On appeal, Defendants do not dispute that Plaintiff made a submissible case on causation with respect to her nerve damage theory of liability.

[8] Defendants' experts' testimony regarding Plaintiff's possible conversion disorder will be set out in relevant part in the next section of our opinion.

on either one of his two theories [of negligence], we would have to remand the case for a new trial") (abrogated on other grounds).

On appeal, Defendants argue only that Plaintiff failed to make a submissible case on the issue of causation with respect to the conversion disorder theory of liability. Accordingly, our discussion is limited to only that contested element and theory of Plaintiff's dental malpractice claim. *See Huelskamp*, 475 S.W.3d at 168-71, 171 n.6 (similarly limiting our discussion of whether the plaintiff made a submissible case on the issue of causation).

### b. Relevant Law and Evidence Presented at Trial Regarding the Conversion Disorder Theory of Liability

As previously stated, Plaintiff's conversion disorder theory of liability alleged Defendant O'Keeffe's negligent conduct of lacerating Plaintiff's tongue caused her to suffer a conversion disorder that in turn, caused her voice disorder. It is undisputed on appeal that proof of causation with respect to this theory of liability requires a certain degree of expertise, and therefore, (1) Plaintiff was required to establish such causation with expert testimony, and (2) the expert testimony must have been given within a reasonable degree of medical certainty. *See Sanders*, 364 S.W.3d at 208; *Sundermeyer*, 271 S.W.3d at 554-56; *Watson*, 304 S.W.3d at 240.

Viewing *all* evidence and reasonable inferences that can be drawn therefrom in the light most favorable to Plaintiff, including testimony from Defendants' experts that aids Plaintiff in making a submissible case, we hold Plaintiff established a submissible case of causation with respect to the conversion disorder theory of liability for the reasons discussed below. *See Rauschelbach*, 372 S.W.2d at 125; *Huelskamp*, 475 S.W.3d at 168; *Tompkins*, 822 S.W.2d at 464; *Pettet*, 718 S.W.2d at 189; *Yoos*, 645 S.W.2d at 183; *Cignetti*, 692 S.W.2d at 334.

First, Plaintiff's expert Dr. Charles Fuszner, a general dentist for over thirty-eight years and dental school instructor, testified to a reasonable degree of medical certainty that but for Defendant O'Keeffe lacerating Plaintiff's tongue with the dental drill, she would not have a

12

voice disorder. He also agreed there was evidence showing, *inter alia*, that a conversion disorder caused Plaintiff's voice disorder.

Moreover, Defendants' speech pathologist expert, Dr. Dennis Fuller, testified to a reasonable degree of medical certainty as follows. Dr. Fuller specifically testified Plaintiff was not at fault in any way for having developed her voice disorder, and Plaintiff's voice disorder "most likely [ ] represent[ed] a conversion disorder." Dr. Fuller also agreed the details in Plaintiff's VA medical records, which provided "[i]t is likely that the initial injury caused pain/discomfort causing [Plaintiff] to alter her tongue posture, tongue movements, and even jaw movement in an attempt to minimize the pain while trying to verbally communicate her messages," were "typical for a conversion disorder." Moreover, when Dr. Fuller was asked, "but for Dr. O'Keeffe slicing [Plaintiff's] tongue open, we wouldn't be here talking about any of those things?" he responded, "[t]hat's correct."

In addition, Defendants' ear, nose, and throat expert, Dr. John Eisenbeis, testified to a reasonable degree of medical certainty that: Plaintiff had a voice disorder after Defendant O'Keeffe lacerated her tongue; there was no evidence Plaintiff had a similar speech pattern or any abnormality prior to her tongue injury; "this injury by Dr. O'Keeffe was painful and traumatic enough that [Plaintiff's] speech pattern changed as a result"; "after this painful injury to [Plaintiff's] tongue, . . . a new speech pattern was seeded due to the overall trauma, the pain and the discomfort associated with the injury and the healing process"; and the new speech pattern was "a subconscious thing . . . [i]t's not something voluntary or conscious that [Plaintiff] did."

We hold the above expert testimony constitutes substantial evidence from which the jury could find and reasonably infer that Defendant O'Keeffe's negligent conduct of lacerating Plaintiff's tongue with a dental drill caused or contributed to cause Plaintiff's injury to her

13

tongue and her resulting conversion and voice disorders. Accordingly, there was substantial evidence presented at trial to establish the cause in fact prong of the element of causation with respect to Plaintiff's conversion disorder theory of liability. *See Lowe*, 592 S.W.3d at 18-19, 18 n.4; *Huelskamp*, 475 S.W.3d at 168-71.

Similarly, we also hold the above expert testimony constitutes substantial evidence and expert testimony that established proximate causation with respect to Plaintiff's conversion disorder theory of liability, especially considering Dr. Fuller's testimony that he agreed specific details set forth in Plaintiff's VA medical records were "*typical* for a conversion disorder."[9] (emphasis added). A jury could reasonably find and infer from this portion of Dr. Fuller's testimony that Plaintiff's injury to her tongue and resulting conversion and voice disorders were "natural and probable consequence[s]" of Defendant O'Keeffe's negligent conduct and were not "surprising, unexpected or freakish." *See Sanders*, 364 S.W.3d at 210; *Huelskamp*, 475 S.W.3d at 169; *see also Patrick v. Alphin*, 825 S.W.2d 11, 12, 13-14 (Mo. App. E.D. 1992) (finding there was substantial evidence to establish proximate cause and medical causation where, similar to here and *inter alia*, there was evidence the plaintiff's symptoms after his injuries were "*typical*" of the medical condition at issue) (emphasis added).[10]

### 5. Conclusion as to Defendants' First Point on Appeal

We hold Plaintiff sufficiently established, by expert testimony given within a reasonable degree of medical certainty, that Defendant O'Keeffe's conduct was both the cause in fact and the proximate cause of Plaintiff's injuries pursuant to a conversion theory of liability. Therefore, Defendants' arguments that Plaintiff failed to make a submissible case of dental malpractice on

---

[9] As previously stated, these specific details provided, "[i]t is likely that the initial injury caused pain/discomfort causing [Plaintiff] to alter her tongue posture, tongue movements, and even jaw movement in an attempt to minimize the pain while trying to verbally communicate her messages."

[10] *Cf. Green v. Ralston Purina Co.*, 376 S.W.2d 119, 121, 125 (Mo. 1964) (finding proximate causation was not established in breach of implied warranty case involving the death of the plaintiff's chickens when, in contrast to here and *inter alia*, "[t]here was no evidence that the [manifested] symptoms . . . were *typical* symptoms to be expected" under the plaintiff's theory of liability) (emphasis added).

the issue of causation have no merit. *See Sanders*, 364 S.W.3d at 208, 210; *Sundermeyer*, 271 S.W.3d at 554-56; *Lowe*, 592 S.W.3d at 18-19, 18 n.4; *Huelskamp*, 475 S.W.3d at 168-71; *Watson*, 304 S.W.3d at 240; *see also Rauschelbach*, 372 S.W.2d at 125; *Tompkins*, 822 S.W.2d at 464; *Pettet*, 718 S.W.2d at 189; *Yoos*, 645 S.W.2d at 183; *Cignetti*, 692 S.W.2d at 334. For the reasons set out above, the trial court did not err in denying Defendants' motion for JNOV with respect to the issue of causation. Point one is denied.

**B.      Whether the Trial Court Erred in Failing to Reduce the Jury's Award of $2.5 Million in Noneconomic Damages Pursuant to Section 538.210 RSMo 2016**

In Defendants' second point on appeal, they assert the trial court erred in failing to reduce the jury's award of $2.5 million in noneconomic damages pursuant to the limits on noneconomic damages set forth in section 538.210 RSMo 2016.[11]

**1.      Relevant Background**

On July 26, 2013, Plaintiff filed her initial petition asserting a dental malpractice claim against Defendants, alleging she was injured by Defendant O'Keeffe's purported negligence on October 9, 2012 when he lacerated her tongue with a dental instrument during a crown preparation procedure ("Plaintiff's 2013 Petition" or "2013 Petition"). It is undisputed on appeal that Plaintiff's 2013 Petition raised a common law dental malpractice claim. It is also undisputed in this appeal that as of the date Plaintiff was allegedly injured by Defendant O'Keeffe's purported negligence (October 9, 2012), and as of the date Plaintiff filed her 2013 Petition (July 26, 2013), (1) Plaintiff had a legal right to pursue such a common law dental malpractice claim; and (2) such a cause of action permitted Plaintiff to recover an uncapped amount of

---

[11] Unless otherwise indicated, all further statutory references to section 538.210 are to RSMo 2016, which is the version of the statute that was effective from August 28, 2015 to August 27, 2017.

noneconomic damages from Defendants in a jury trial so long as such an award was not excessive.[12]

After Plaintiff filed her 2013 Petition, the legislature amended section 538.210 RSMo in 2015, and the amendments were effective from August 28, 2015 to August 27, 2017 ("the 2015 amendments"). *See* section 538.210. Pursuant to the 2015 amendments, section 538.210 provides in relevant part:

> 1. A statutory cause of action for damages against a health care provider for personal injury or death arising out of the rendering of or failure to render health care services is hereby created, replacing any such common law cause of action. The elements of such cause of action are that the health care provider failed to use that degree of skill and learning ordinarily used under the same or similar circumstances by members of the defendant's profession and that such failure directly caused or contributed to cause the plaintiff's injury or death.
>
> 2. (1) In any action against a health care provider for damages for personal injury arising out of the rendering of or the failure to render health care services, no plaintiff shall recover more than four hundred thousand dollars for noneconomic damages irrespective of the number of defendants.
>
> (2) Notwithstanding the provisions of subdivision (1) of this subsection, in any action against a health care provider for damages for a catastrophic personal injury arising out of the rendering or failure to render heath care services, no plaintiff shall recover more than seven hundred thousand dollars for noneconomic damages irrespective of the number of defendants.
>
> . . .
>
> 8. The limitations on awards for noneconomic damages provided for in this section shall be increased by one and seven-tenths percent on an annual basis effective January first of each year. The current value of the limitation shall be calculated by the director of the department of insurance, financial institutions and professional registration, who shall furnish that value to the secretary of state, who shall publish such value in the Missouri Register on the first business day following January first, but the value shall otherwise be exempt from the provisions of section 536.021 [RSMo].

---

[12] We note that in Defendants' third point on appeal, they assert the trial court erred in failing to remit the jury's verdict awarding Plaintiff a total of $2.5 million in noneconomic damages on the grounds the award was excessive. For the reasons discussed below in Section II.C. of this opinion, we disagree.

In other words, the 2015 amendments to section 538.210 expressly created a statutory cause of action for medical and dental malpractice that "replac[ed] any such common law cause of action." *See* Section 538.210.1. In addition, the 2015 amendments to section 538.210 set forth limits, otherwise known as caps, for the amount of noneconomic damages a plaintiff could recover from a healthcare provider in a statutory cause of action for medical or dental malpractice. *See* section 538.210.2(1)-(2); section 538.210.8.

After the above amendments to section 538.210 went into effect on August 28, 2015, Plaintiff filed a second petition on March 24, 2016, again alleging a cause of action for dental malpractice against Defendants ("Plaintiff's 2016 Petition" or "2016 Petition"). Subsequently, Plaintiff voluntarily dismissed her 2013 Petition without prejudice on April 4, 2016. Plaintiff's 2016 Petition is a word-for-word copy of Plaintiff's 2013 Petition, with both pleadings containing the same allegations, including the allegations that Plaintiff was injured by Defendant O'Keeffe's purported negligence on October 9, 2012.

After the jury awarded Plaintiff a total of $2.5 million in noneconomic damages on her dental malpractice claim and the trial court entered a judgment in accordance with the jury's verdict, Defendants filed a post-trial motion. Defendants' post-trial motion alleged in relevant part that the trial court should reduce the jury's noneconomic damages award to the cap imposed in section 538.210 for non-catastrophic injuries as of the time of the post-trial motion ($427,901).

Plaintiff filed a responsive motion asserting that pursuant to Missouri law and Article I, section 13 of the Missouri Constitution, the 2015 amendments to section 528.210 cannot be applied retroactively to limit Plaintiff's award pursuant to the jury verdict because Plaintiff's cause of action accrued when she was injured by Defendant O'Keeffe's purported negligence on October 9, 2012, which was before the law went into effect on August 28, 2015. The trial court

17

subsequently denied Defendants' post-trial motion, implicitly agreeing with Plaintiff's argument in her responsive motion.

### 2.    The Issue in this Point on Appeal, Standard of Review, and Relevant Law

The issue in this point on appeal is whether the trial court erred in failing to apply the 2015 amendments to section 528.210 to reduce the jury's noneconomic damages award under the facts of this case. Whether a statute applies to a given set of facts is reviewed de novo. *White v. Tariq*, 299 S.W.3d 1, 3 (Mo. App. E.D. 2009).

"The Missouri Constitution prohibits laws that are retrospective in operation." *Hess v. Chase Manhattan Bank, USA, N.A.*, 220 S.W.3d 758, 769 (Mo. banc 2007) (emphasis omitted) (citing Mo. Const. art. I, sec. 13). "A law is retrospective in operation if it takes away or impairs vested or substantial rights acquired under existing laws or imposes new obligations, duties, or disabilities with respect to past transactions." *Hess*, 220 S.W.3d at 769 (emphasis omitted).

In *Klotz v. St. Anthony's Medical Center*, the Missouri Supreme Court held the application of a statute's purported cap on noneconomic damages to a cause of action that accrued before the effective date of the law violates the constitutional prohibition of retrospective laws because such an application of the statute would take away a plaintiff's substantive right to a benefit that has already accrued. 311 S.W.3d 752, 758-60 (Mo. banc 2010) (discussing the purported cap on noneconomic damages in a former version of section 538.210); *see also Gervich v. Condaire, Inc.*, 370 S.W.3d 617, 623-24 (Mo. banc 2012) (applying *Klotz* and holding amendments to a worker's compensation statute purporting to decrease the benefit an injured worker could receive after the cause of action accrued could not be applied retroactively because the amendments "would eliminate a right to a benefit that ha[d] already accrued," and would "materially alter substantive rights"); *see generally Hess*, 220 S.W.3d at 769.

18

Pursuant to section 516.105 RSMo Supp. 2005 (effective from August 28, 2005 to August 27, 2016) and subsequent versions of the statute, a medical malpractice or dental malpractice cause of action generally accrues on "the date of occurrence of the act of neglect complained of," i.e., on the date of the alleged negligence and injury. *See* section 516.105 RSMo Supp. 2005; section 516.105 RSMo 2016 (effective August, 28 2016 to August 27, 2018); section 516.105.1 Cum. Supp. 2018 (effective August 28, 2018 to the present); *Swallows v. G. Wendell Weathers, D.D.S., P.C.*, 915 S.W.2d 763, 764 (Mo. banc 1996) (indicating that under section 516.105 RSMo 1994, a plaintiff's dental malpractice action accrued on the date the alleged act of negligence occurred); *see also Klotz*, 311 S.W.3d at 758, 759 (indicating the plaintiff's medical malpractice action accrued at the time his injuries occurred in March 2004).

Based on the foregoing, a plaintiff's right to compensation and the substantive law applicable to his or her claim is governed by the law in effect at the time of the alleged negligence and injury occurs, and to hold otherwise would violate the constitutional prohibition of retrospective laws. *See id.*; *Gervich*, 370 S.W.3d at 623-24; *Klotz*, 311 S.W.3d at 758-60; *see also Sanders*, 364 S.W.3d at 200-01, 200 n.1 (providing that in a medical malpractice case, the law in effect at the time the purported negligence occurred governs).

**3.     Analysis**

In this case, Plaintiff's dental malpractice cause of action accrued on October 9, 2012, which was the date Plaintiff alleged she was injured by Defendant O'Keeffe's purported negligence. *See* section 516.105 RSMo Supp. 2005; *Klotz*, 311 S.W.3d at 758, 759; *Swallows*, 915 S.W.2d at 764. Accordingly, Plaintiff's right to compensation and the substantive law applicable to her claim are governed by the law in effect on October 9, 2012, and to hold otherwise would violate the constitutional prohibition of retrospective laws. *See id.*; *Gervich*,

19

370 S.W.3d at 623-24; *Klotz*, 311 S.W.3d at 758-60; *see also Sanders*, 364 S.W.3d at 200-01, 200 n.1.

As previously stated, it is undisputed in this appeal that as of October 9, 2012 (the date we find Plaintiff's cause of action accrued on), Plaintiff had a legal right to pursue a common law dental malpractice claim, and such a cause of action permitted her to recover an uncapped amount of noneconomic damages from Defendants in a jury trial if such an award was not excessive. The caps on noneconomic damages set forth in the 2015 amendments to section 538.210 did not go into effect until August 28, 2015, which was almost three years after Plaintiff's cause of action accrued on October 9, 2012. Pursuant to the Missouri Supreme Court's holding in *Klotz*, the application of caps on noneconomic damages set forth in the 2015 amendments to section 538.210 to Plaintiff's cause of action that accrued before the effective date of the law would violate the constitutional prohibition of retrospective laws, because such an application of the statute would take away Plaintiff's substantive right to a benefit that has already accrued. *See Klotz*, 311 S.W.3d at 758-60; *see also Gervich*, 370 S.W.3d at 623-24 (applying and explaining *Klotz*); *Hess*, 220 S.W.3d at 769 (generally discussing the constitutional prohibition of retrospective laws).

In this appeal, Defendants primarily raise two arguments. First, Defendants assert Plaintiff's cause of action for dental malpractice did not accrue until she filed her second, 2016 Petition on March 24, 2016, which was after the 2015 amendments to section 538.210 went into effect on August 28, 2015. Second, Defendants contend Plaintiff abandoned the right she had to the benefits of a common law dental malpractice claim and Plaintiff only had the right to the benefits of a statutory cause of action under section 538.210, because she dismissed her 2013 Petition and filed her 2016 Petition after the 2015 amendments to section 538.210 went into

20

effect. Because Defendants have failed to cite any controlling legal authority to support these two arguments, and we can find no such legal authority, they have no merit.

### 4. Conclusion as to Defendants' Second Point on Appeal

Based on the foregoing, the trial court did not err in failing to apply the 2015 amendments to section 538.210 to reduce the jury's award of noneconomic damages under the facts of this case. Point two is denied.

### C. Whether the Trial Court Erred in Failing to Remit the Jury's Award of $2.5 Million in Noneconomic Damages on the Grounds the Award was Excessive

In Defendants' third and final point on appeal, they assert the trial court erred in failing to remit the jury's verdict awarding Plaintiff a total of $2.5 million in noneconomic damages ($500,000 in past noneconomic damages and $2 million in future noneconomic damages) on the grounds the award was excessive. For the reasons discussed below, we disagree.

### 1. General Law and Standard of Review

The purpose of a compensatory damages award is to fairly and reasonably compensate a plaintiff for her injuries. *Payne v. Fiesta Corporation*, 543 S.W.3d 109, 130 (Mo. App. E.D. 2018). In general, the determination of the amount of damages to award a plaintiff is primarily for the jury. *Id.* "Additionally, we afford the trial court broad discretion in deciding whether remittitur should be ordered; we review this decision using an abuse of discretion standard, and we will only interfere with the jury's verdict if the award is so grossly excessive that it shocks the conscience of the court and convinces us that both the trial judge and the jury have abused their discretion." *Id.* (quotations omitted).

In determining whether the trial court abused its discretion by allowing an excessive award of damages, we only consider the evidence at trial in the light most favorable to the trial court's decision denying remittitur, and we disregard any evidence to the contrary. *Badahman v. Catering St. Louis*, 395 S.W.3d 29, 39-40 (Mo. banc 2013); *Payne*, 543 S.W.3d at 130. "In fact,

21

if a trial court approves a jury's verdict, its discretion is practically conclusive. *Payne*, 543

S.W.3d at 130 (quotations omitted).

"There are two general types of excessive verdicts: (1) a verdict that is disproportionate

to the evidence of injury and results from an 'honest mistake' by the jury in assessing damages;

and (2) a verdict that is excessive due to trial error that causes bias and prejudice by the jury."

*Id*. at 131 (quotations omitted). In this case, Defendants argue the allegedly excessive verdict

was a result of both of these "general types of excessive verdicts." *See id*. Nevertheless, there is

an important difference between excessive verdicts caused by an "honest mistake" of the jury in

determining damages and those resulting from "trial court error that causes bias and prejudice by

the jury." *Id*. Specifically, a finding by our Court that a verdict is excessive due to an "honest

mistake" of the jury may be remedied by ordering remittitur or granting a new trial. *Id*.

However, if we find an excessive verdict resulted from trial court error that caused jury bias and

prejudice, a new trial must be held and merely ordering remittitur is not an option. *Id*.

Finally, as recently stated by this Court:

No precise formula exists to determine whether a verdict is excessive, and the inquiry is fact-specific. Moreover, the range between an inadequate award and an excessive award for pain and suffering can be enormous and substantial disparity among juries as to what constitutes pain and suffering must be expected. However, to help guide the analysis, Missouri courts consider a number of factors for determining whether an award is excessive: (1) loss of income, both present and future; (2) medical expenses; (3) plaintiff's age; (4) the nature and extent of plaintiff's injuries; (5) economic considerations; (6) awards given and approved in comparable cases; and (7) the superior opportunity for the jury and the trial court to evaluate plaintiff's injuries and other damages. Additionally, the jury is allowed to consider intangible or non-economic damages, such as past and future pain, suffering, effect on life-style, embarrassment, humiliation, and economic loss.

*Id.* (internal citations and quotations omitted)

22

## 2. Analysis

In this case, Plaintiff only requested an award of non-economic damages, which include, *inter alia*, "past and future pain, suffering, effect on life-style, embarrassment, [and] humiliation." *See id*. As explained in detail below, there was a significant amount of evidence presented at trial regarding these sub-sets of damages.

### a. Evidence of Plaintiff's Non-Economic Damages

First, Defendants' expert speech pathologist, Dr. Fuller, testified Plaintiff's injuries including her voice disorder have been "devastating" and "awful." He also testified Plaintiff's voice disorder made it difficult for people to understand her and difficult for her to make people understand what she was saying. Dr. Fuller further testified that when patients develop voice disorders later in life, it can affect their ability to interact with their family, friends, and the public at large. He further explained voice disorders affect such patients' self-esteem, as they feel people perceive them to be less intelligent than they were when they could speak without a voice disorder and that these types of concerns result in patients withdrawing from society and social activities they enjoyed before.

Additionally, Plaintiff testified via a March 2014 video deposition, which was shown to the jury at trial, that when she spoke to people they would ask if she was hearing impaired, and people would make fun of her because of the way she spoke. She also testified she had difficulties talking with her grandson on the phone, as he struggled to understand her. Plaintiff also stated she avoided communicating with people, cried a lot because of her speech problems, everything speech-wise was a struggle for her, and her injury had changed her whole life.

Plaintiff also testified live at trial (which took place almost five years after her deposition and over six years since she had been injured) that her injuries and resulting voice disorder continued to cause her pain and suffering, affected her lifestyle, and caused her embarrassment

23

and humiliation. Plaintiff specifically testified she did not enjoy life like she used to, she could no longer sing which was something she loved to do before her injury, and she could not eat a lot of the same foods she enjoyed prior to the injury. In particular, Plaintiff had felt a sense of accomplishment from participating in funeral honors for service members prior to her injury, and she testified she no longer wanted to participate because she would be required to speak at such events. Plaintiff also explained to the jury that, unlike prior to her injuries, she had no social life and did not want to date due to her voice disorder. Moreover, Plaintiff testified her "injury has changed [her] whole life," she is "reminded every day of it," and "it's embarrassing . . . when [she has] to repeat [herself] over and over."

Additionally, Plaintiff's VA medical records from after the injury were read into evidence, which provided in relevant part: Plaintiff was very emotional because of slurred speech and stuttering; Plaintiff was afraid to go home because she did not want her family and friends to hear her speak; Plaintiff was upset and avoided social situations; Plaintiff had a history of anger, sadness, and frustration because her voice disorder was "very embarrassing" and "life changing"; and Plaintiff was unable to engage in activities she used to find enjoyable including singing and talking with her grandchildren. The VA records also provided:

> [Plaintiff's] quality of life has been severely diminished by the speech impediment that she now has, as well as the migraines and oral pain that cannot be adequately treated. Prior to her injury, [Plaintiff] was extremely active, talkative, socially engaged, and loved to perform Karaoke in front of a crowd. Since her injury, her speech is very impaired. She has done as much speech therapy as possible, and they have told her they can't help her anymore. She says that some people ask her if she is deaf, and others mock her, or treat her like her intelligence is deficient. As a result, she does not like to be around people she doesn't know.

The jury also heard testimony from Plaintiff's best friend, Stacey Neely, who had been friends with Plaintiff for nineteen years as of the time of the trial. Neely testified that while Plaintiff was very upbeat, talkative, and outgoing prior to her injury, after Plaintiff's injury she

24

cried a lot, was introverted, and shied away from situations, including family events, so she would not have to explain her voice disorder. Neely also testified that in "pretty much every single interaction [Plaintiff has with the public,] she has [to] repeat [ ] herself multiple times."

Similarly, while Plaintiff's mother Mary Bojorquez ("Mrs. Bojorquez" or "Plaintiff's Mother") described Plaintiff as a "social butterfly" prior to her injury, Mrs. Bojorquez explained Plaintiff's social life and life in general had completely changed due to her injuries. Specifically, Plaintiff did not go out to eat because she did not want to have to explain her condition, and Plaintiff was no longer able to perform her duties at work because business over the phone was no longer possible for her. Plaintiff's Mother also testified Plaintiff now mainly communicates in text messages because that is the only way she is able to speak like she used to.

Moreover, Plaintiff's treating speech pathologist, Dr. Harmon, testified Plaintiff will not regain any additional speech function and would not benefit from any other speech therapies.

In sum, there was substantial evidence presented at trial demonstrating, (1) Plaintiff's injuries and resulting voice disorder have caused her pain and suffering, impacted her lifestyle, and caused her embarrassment and humiliation; and (2) Plaintiff will continue to suffer such noneconomic damages in the future.

### b. Defendants' Arguments on Appeal

In this case, Defendants first argue the jury's verdict awarding Plaintiff $2.5 million in noneconomic damages is excessive because it is disproportionate to the evidence of injury and results from an 'honest mistake' by the jury in assessing damages. *See Payne*, 543 S.W.3d at 131. In making this argument, Defendants attempt to discredit the evidence discussed in the previous subsection by downplaying the lasting effects of Plaintiff's injury. However, an assessment of the severity of Plaintiff's damages is a question of fact, which the trial court and the jury are in a superior position to determine. *See id.* at 133 (similarly finding). Specifically,

25

the jury was in a much better position to assess the extent of pain and suffering Plaintiff had endured and likely will endure in the future, as it heard the testimony of Plaintiff and other witnesses. *See id.* (similarly finding). Moreover, "the jurors . . . are responsible for weighing the evidence and determining the credibility of witnesses." *Dieser v. St. Anthony's Medical Center*, 498 S.W.3d 419, 441 (Mo. banc 2016). Accordingly, viewing the evidence in the light most favorable to the trial court's decision denying remittitur, we cannot find the compensatory damages award was excessive due to an "honest mistake" of the jury. *See Badahman*, 395 S.W.3d at 39-40; *Payne*, 543 S.W.3d at 131-33; *see also Dieser*, 498 S.W.3d at 441.

Defendants also argue the jury's verdict is excessive due to trial court error that caused bias and prejudice by the jury. *See Payne*, 543 S.W.3d at 131. Defendants specifically argue trial court error occurred with respect to, (1) portions of Plaintiff's closing argument inviting the jury to find Defendants liable under both the nerve damage theory of liability and the conversion disorder theory of liability discussed in Section II.A. of this opinion; and (2) Plaintiff's introduction of three pieces of evidence. The record reflects Defendants failed to preserve any of the aforementioned allegations of trial court error, by failing to object to the issues at the time they were raised at trial and/or by failing to raise the issues in their post-trial motion. *See, e.g., Thomas v. Harley-Davidson Motor Company Group, LLC*, 571 S.W.3d 126, 135 (Mo. App. W.D. 2019); *Porter v. City of St. Louis*, 552 S.W.3d 166, 171 (Mo. App. E.D. 2018). Moreover, because Defendants have not requested plain error review of the alleged trial court errors, we decline to exercise plain error in this case, which is within this Court's discretion to do. *See Porter*, 552 S.W.3d at 171-72 (similarly finding). Therefore, Defendants' argument that the jury's verdict is excessive due to alleged trial court error causing bias and prejudice by the jury has no merit on appeal.

Finally, Defendants argue our Court should order remittitur of the jury's verdict in this case because such an order would be consistent with Missouri public policy, including the legislature's "consistently imposed limits on noneconomic damages" and "[t]ort reform statutes affecting compensatory and punitive damages." However, because Defendants have failed to support this public policy argument with any controlling legal authority, and because we can find no such authority, it has no merit.

### 3. Conclusion as to Defendant's Third Point on Appeal

Based on the foregoing, we cannot find the jury's award of a total of $2.5 million in noneconomic damages is "so grossly excessive that it shocks the conscience of the court and convinces us that both the trial judge and the jury have abused their discretion." *See Payne*, 543 S.W.3d at 130 (quotations omitted). Accordingly, the trial court did not abuse its discretion in failing to remit the jury's award of noneconomic damages. *See id*. Point three is denied.

## III.    CONCLUSION

The trial court's judgment entered upon the jury verdict awarding Plaintiff a total of $2.5 million in noneconomic damages on Plaintiff's dental malpractice claim is affirmed.


_____
ROBERT M. CLAYTON III, Presiding Judge

Robert G. Dowd, Jr., J., and
Roy L. Richter, J., concur.

27